[Civ. No. 2323. Fifth Dist. May 14, 1976.]

FRANCIS S. CHANNELL et al., Plaintiffs and Respondents, v. JOSEPH ANTHONY et al., Defendants and Appellants.

**COUNSEL**

Bernard Grossman and Joseph R. Bailey for Defendants and Appellants.

Douglas H. Glasrud and Irwin & Thuesen for Plaintiffs and Respondents.

**OPINION**

**CARKEET, J.***—This case was tried before a jury on a cause of action against all defendants alleging a conspiracy to defraud plaintiffs, and actual fraud and oppression in the sale by plaintiffs of certain real property to Joseph and Claire Anthony, and John and Gustine Weber.

On November 2, 1973, the jury returned a verdict in favor of defendants Gustine L. Weber, and Sam and Joan Pizzillo. The jury awarded plaintiffs actual damages of $25,000, and punitive damages of $13,750 against defendant Joseph Anthony, $250 against defendant Claire Anthony, and $11,250 against defendant John B. Weber. Judgment was entered on November 5, 1973.

On November 8, 1973, defendants filed motions for a new trial and for judgment notwithstanding the verdict. The motions were heard on December 21, 1973. The court denied the motions for a new trial and for judgments notwithstanding the verdict as to defendants Joseph and Claire Anthony, and granted judgment notwithstanding the verdict as to defendant John B. Weber. A minute order to that effect was entered December 31, 1973, and judgment was entered January 8, 1974.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

Notice of appeal from the judgment entered November 5, 1973, was filed February 7, 1974, by defendants Joseph and Claire Anthony. A notice of appeal from the judgment entered January 8, 1974, in favor of defendant John Weber was filed February 25, 1974, by plaintiffs Francis and Flora Channell.

By stipulation filed with this court on April 1, 1975, the appeal of Francis and Flora Channell from the judgment in favor of John B. Weber was dismissed.

The evidence presented at the trial was in sharp conflict. Following established rules, this court will review the evidence in the light most favorable to the prevailing parties (plaintiffs-respondents), giving them the benefit of every reasonable inference, and resolving conflicts in support of the judgment. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, p. 4236.)

In March of 1972, Mr. and Mrs. Channell owned a 51-acre ranch in the Del Rey area of Fresno County, consisting of approximately 10½ acres of peaches, 4 acres of plums, 35 acres of Thompson vines, and an additional 1½ acres on which was a farm house, barn, and additional citrus trees. A secured loan on the property was held by the Farmer's Home Administration.

During the middle and late 1960's because of financial difficulties the Channells were unable to pay property and water taxes, or meet their loan payments with the Farmer's Home Administration. They consulted with Mr. Therlow Leach of the Farmer's Home Administration who advised them to sell part of the ranch in order to meet their obligations, following which, on July 18, 1969, the Channells listed the property with a realtor for $85,000. The Channells were unable to affect a sale at that price and once again consulted Leach who recommended a sale price of $60,000. On December 9, 1971, the Channells entered into another listing with a different realtor for $60,000, but were again unable to find a buyer, and in late 1971 or early 1972 were told by Leach that they should hurry and sell the property since the Farmer's Home Administration was going to have to foreclose. Pressure was put on the Channells to "clear out" by the Farmer's Home Administration, when Leach was told in late 1971 that the water district was going to take the property because of delinquent taxes.

Concerned about listing the property again, the Channells attempted to sell it themselves, and at the same time they tried unsuccessfully to obtain new loans. They told neighbors in the area that they needed to sell the property. They received several offers, including one for approximately $40,000, but refused them after Leach advised them that he felt the $40,000 offer was too low.

Later, Mr. Pizzillo, a neighbor, asked if the property was still for sale and indicated that he had a nephew who would be interested in purchasing it. Mr. Channell told Pizzillo that he wanted to sell only the back 40 acres, keeping the front 10 acres.

The next day the nephew, defendant-appellant Joseph Anthony, came to the property, looked it over, and talked to the Channells. The Channells told Anthony how broke they were, that they were unable to get a loan, and showed him their bills. In addition, they told him that Leach had said they should get $60,000 for the property but that they had been unable to get such an amount or borrow on the property. They also said they only wanted to sell the back 40 acres, and wanted to keep the front 10 acres to live on.

Anthony told the Channells he was a state commissioner in Los Angeles, and a licensed real estate broker. He showed them some sort of commissioner's badge, and said he would go down to the Farmer's Home Administration and find out what was happening. He returned to the ranch the next day and said the Farmer's Home Administration was trying to get the property for a quick sale to make a "fast buck," that they (the Farmer's Home Administration) knew of buyers for the property but told such prospective buyers that Mr. Channell was emotionally disturbed, and thereafter the buyers would back off.

He said the Channells could sue the Farmer's Home Administration for enough to get a 100-acre ranch, that he had gathered proof and would supply it after the sale was in escrow, and that he had a lawyer. He also said he was buying land in the area and would give Mr. Channell a steady job. Anthony also said he would see to it that Mrs. Channell could go to Texas to visit her daughter who was having a baby, and that he would pay off all of the bills of the Channells totalling about $3,000. In addition, he said he would see to it that Mr. Channell's credit rating at a bank was in good standing.

Anthony said he would write up an agreement to get the property away from the Farmer's Home Administration. The Channells and Anthony wrote out an agreement in longhand dated March 18, 1972. The agreement provided that the Anthonys would purchase the property by assuming the Channells' FHA loan of approximately $21,500, county property taxes of approximately $6,500, irrigation district taxes of approximately $4,000, and a packing-house encumbrance of approximately $2,700. A second document, a management contract, provided that the Channells could live on the property 10 years rent free in exchange for operating and maintaining the farm except for pruning and picking. It also provided that if the crops yielded over $15,000 annually the Channells would receive a bonus of 5 percent of the amount over $15,000. Mrs. Channell read the sale agreement and said if she signed it she would be giving away Mr. Channell's whole life. Anthony said she would not, Mrs. Pizzillo said she had to trust Mr. Anthony, and Mrs. Anthony said they were honest people who wouldn't do that to anybody. When Mr. Channell saw the document he said "You're not supposed to trust nobody like that," but Mrs. Channell told him they had to trust somebody.

Anthony also told the Channells the documents were just "for show" to get the property away from the Farmer's Home Administration, and that they would be torn up after the property was in escrow. In addition, the Anthonys said they would only take the back 40 acres with the Channells retaining the front 10, that the Channells' bills would be paid, that Mr. Anthony would send the Channells to Texas, and that Mr. Channell would work for him. Mrs. Anthony said the Channells should sign the agreement or else they wouldn't have a shovel to dig themselves a hole with. The Channells signed the documents.

The following Monday (two days later) the Channells went to their son and daughter-in-law's for dinner and showed them the agreement. The son and daughter-in-law warned the Channells to be cautious, since the Anthonys might make them abide by the terms of the agreement and if so, the Channells "wouldn't have anything left."

The Channells next visited their bookkeeper, a Mrs. Roberts, to seek her advice regarding the agreement. After looking over the agreement, Mrs. Roberts also told the Channells to be careful and to get a lawyer, because the Anthonys could make them adhere to the terms of the agreement. In addition, Mrs. Roberts wrote out a letter for the Channells asking the Anthonys to give them two and one-half acres and their home

as a life estate. Mrs. Channell later showed the letter to Mrs. Pizzillo and then sent it, along with a letter of her own, to Anthony, asking if he would "be interested in making a deal with me such as this." The Channells received no reply to the letter.

In the meantime, on March 20, a Monday, Mr. Anthony opened up an escrow and obtained escrow papers. Anthony later told Mr. Weber, who was a real estate salesman in Anthony's office at the time, about the Channell property and asked him if he wanted to help finance the sale. Mr. Weber was noncommittal but said he would look at the place.

On March 22, Anthony received a phone call from Mrs. Pizzillo who informed him that the Channells wanted to change the agreement. The next day Anthony and Weber returned to the property with the escrow papers but both Mr. and Mrs. Channell refused to sign. Anthony learned of rumors that people were trying to undermine the agreement.

Weber and Anthony then went to an attorney's office in Fresno and Anthony filed a complaint for specific performance of the agreement against the Channells. When served with the lawsuit the Channells were extremely upset and at a loss to know what to do. They thought about hiring an attorney, but did not have the money to do so.

Near the end of the week Anthony and Weber returned to the property bringing with them the escrow papers and a new management agreement. The new agreement provided that Mr. Channell was to manage and supervise farm operations, and in return Mr. and Mrs. Channell would be able to reside on the property, would receive $25 per week, and if net income from the crops exceeded $15,000 annually would be paid 10 percent of the excess over $15,000. The agreement was dated March 31, 1972. Anthony and Weber told the Channells that if they signed the escrow instructions the lawsuit would be dropped. They also said they were going to pay Mr. Channell to work on other ranches, and that the new management agreement was necessary "to get it into escrow." They explained that the new agreements were necessary to get the property away from the Farmer's Home Administration. The Channells signed some papers in their home but were told copies of the escrow papers had to be signed in front of a notary public. The Channells, Anthony and Weber then drove to a notary public's office.

At the notary public's office the Channells signed not only escrow instructions but also a deed. However, the Channells were unaware they

were signing a deed and in fact thought they were only signing escrow instructions. If they had known about the deed they would have refused to sign it. They did not read the deed, but the heading reading "Joint Tenancy Grant Deed" was not concealed. However, neither Mr. nor Mrs. Channell can read without a pair of glasses they share between them, and which they failed to bring to the notary public's office.

At the time they signed the documents Anthony told the Channells that he and Weber were going to keep their promise, the Channells should trust them, and that he would take care of them.

A few days later Anthony and Weber returned to the property with amended escrow instructions which the Channells signed. The amended instructions, dated April 7, 1972, added John and Gustine Weber as joint tenants along with Joseph and Claire Anthony.

Shortly thereafter Mrs. Channell became upset regarding the sale and told the Pizzillos they were "crooks" and "vultures." Whenever Weber or Anthony would come on the property Mrs. Channell would become angry and at one point told them just to give Mr. Channell the $3,000 and they would leave. Another time she kicked Mr. Weber and stomped on some small walnut trees on the property.

A couple of months after signing the deed Mrs. Channell returned to the notary public's office to see in fact what they had signed, and discovered they had signed a deed.

The Channells continued to live on the ranch and Mr. Channell worked under the management contract. Mr. Channell apparently believed that if he fulfilled his duties under the contract, Anthony and Weber would be "fair" with him. During this period of time Mr. Channell received $100 a month under the contract.

Thereafter, however, Mr. Channell stopped his work on the ranch and subsequently the Channells were served with a "Three Day Notice to Surrender Possession of the Premises" dated July 26, 1972, and signed by Mr. Robbins, the attorney for Anthony and Weber. The Channells remained on the property, and ultimately were served with a complaint for unlawful detainer, filed September 8, 1972, in municipal court, by Joseph and Claire Anthony. Thereafter the Channells moved off the property. Judgment was entered in the unlawful detainer action ordering the Channells to vacate the premises but "without prejudice to the

defendant's right to file any other action." The prior specific performance action was dismissed without prejudice.

Testimony by appellants' witnesses contradicted many of the above facts. Specifically, Anthony testified he made no collateral promises to the Channells concerning their retention of part of the property, payment of their personal indebtedness, a trip to Texas, suing the Farmer's Home Administration, employing Mr. Channell on other properties, re-establishing their credit rating, or straightening out their financial affairs. The jury, however, apparently believed the testimony of the Channells and their witnesses.

Numerous issues have been raised by this appeal and the court disposes of them in the order hereinafter stated.

## I. IS THE APPEAL TIMELY?

Judgment was originally entered in this case on November 5, 1973, and notice of entry of judgment was mailed by the clerk on November 6, 1973. Subsequently, defendants filed motions for a new trial and for judgment notwithstanding the verdict. The court denied these motions as to defendants Joseph and Claire Anthony but granted judgment notwithstanding the verdict as to defendant John Weber. A minute order to that effect was entered December 31, 1973, and judgment was entered January 8, 1974. A notice of appeal, filed February 7, 1974, was taken from the judgment entered November 5, 1973, by defendants Joseph and Claire Anthony. The notice of appeal also stated that defendants' motion for a new trial had been denied as of January 8, 1974.

The above facts disclose that the defendants' notice of appeal was filed more than three months after the mailing of notice of the original entry of judgment on November 6, 1974, 38 days after entry of the minute order denying defendants' motion for a new trial on December 31, 1974, and 30 days after the final entry of judgment on January 8, 1974.

Under the California Rules of Court, rule 2(a): "[N]otice of appeal shall be filed within 60 days after the date of mailing notice of entry of judgment by the clerk of the court . . . ."

Rule 2(b) provides that: "For the purposes of this rule: (1) The date of entry of a judgment shall be the date of its entry in the judgment book. (2) The date of entry of an appealable order which is entered in the

minutes shall be the date of its entry in the permanent minutes, unless such minute order as entered expressly directs that a written order be prepared, signed and filed, in which case the date of entry shall be the date of filing of the signed order."

However, under rule 3(a): "When a valid notice of intention to move for a new trial is served and filed by any party and the motion is denied, the time for filing the notice of appeal from the judgment is extended for all parties until 30 days after either entry of the order denying the motion or denial thereof by operation of law . . . ."

Finally, Code of Civil Procedure section 660 provides that: "A motion for a new trial is not determined within the meaning of this section until an order ruling on the motion (1) is entered in the permanent minutes of the court or (2) is signed by the judge and filed with the clerk. The entry of a new trial order in the permanent minutes of the court shall constitute a determination of the motion even though such minute order as entered expressly directs that a written order be prepared, signed and filed. The minute entry shall in all cases show the date on which the order actually is entered in the permanent minutes, but failure to comply with this direction shall not impair the validity or effectiveness of the order."

Plaintiffs and respondents argue that under Code of Civil Procedure section 660 and rule 3(a) "the 30-day period in which defendants and appellants could file a valid Notice of Appeal began running from the date of entry of the Minute Order denying the Motion for New Trial on December 31, 1973." Therefore, respondents conclude, "Defendants' and appellants' last day to file a valid and effective Notice of Appeal was January 30, 1974." (It should also be noted that by Jan. 30, 1974, the 60-day period from the notice of the original Nov. 5, 1973, judgment would have long since run.)

Appellants make two separate arguments in response. First, they argue that the only final judgment in this case from which this appeal lies is the judgment dated January 8, 1974, and that under rule 2 appellants had a minimum of 60 days from the notice of entry of that judgment (Jan. 9, 1974) in which to appeal. The appellants stress that when the judgment notwithstanding the verdict as to Weber was granted, one final judgment should have been entered in the case as to all parties (namely, as of Jan. 8, 1974) and the prior judgment should have been specifically ordered

vacated. Instead, appellants contend, there is an anomaly in the record because there is a second judgment n.o.v. which relieves Mr. Weber of all liability; yet, the first judgment stands, which indicates that Mr. Weber still has liability. There can be but one final judgment in an action. (*Bank of America* v. *Superior Court* (1942) 20 Cal.2d 697 [128 P.2d 357].) Nonetheless, appellants assert, all relief was incorporated in the second judgment by implication, and since there cannot be split judgments in a case, the only final and operative judgment was that of January 8, 1974.

Appellants' argument reaches the correct result but uses an unnecessarily circuitous approach. ■ A more simple and direct solution is as follows: Both the minutes of December 31, 1973, and the formal judgment of January 8, 1974, involved not merely the granting of judgment notwithstanding the verdict as to Mr. Weber, and a denial of a new trial as to the Anthonys, but also a denial of judgment notwithstanding the verdict as to the Anthonys. Rule 61(c) defines a judgment as "any order from which an appeal could be taken . . . ." (See also Code Civ. Proc., § 664.5.) Code of Civil Procedure section 904.1, subdivision (d) specifically states that an appeal may be taken from an order "denying a motion for judgment notwithstanding the verdict." Therefore, the denial of the Anthonys' motion for judgment notwithstanding the verdict constituted a judgment, and rule 2 allows 60 days from the mailing of notice of such a judgment in which to appeal. Thus, as a minimum, appellants had 60 days from December 31, 1973, in which to appeal, and their notice of appeal filed February 7, 1974, was well within the 60 days.

In their notice of appeal the appellants mistakenly state they are appealing from the judgment entered November 5, 1973. The notice does not mention the January 8, 1974, judgment. In addition, the notice states: "Please take further notice that said defendants' motion for new trial was denied as of January 8, 1974."

Both rule 1(a) and rule 121(a) state that a notice of appeal is sufficient if it states it is from a "specified judgment". Here the appellants failed to specify, or even mention, the judgment of January 8, 1974.

However, both rules 1(a) and 121(a) also state, "A notice of appeal shall be liberally construed in favor of its sufficiency," and courts have often upheld mistakenly stated appeals. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 333, p. 4310; *Kellett* v. *Marvel* (1936) 6 Cal.2d 464 [58 P.2d 649].) In this case, since there can be only one final

judgment, and since the denial of defendants' motion for judgment notwithstanding the verdict on January 8, 1974, qualifies as a judgment, the January 8 judgment was the only judgment from which an appeal would lie. Since the notice of appeal states it is from a judgment (though the wrong one), and since no prejudice has resulted to respondents (who have argued the merits in their briefs), the notice of appeal should be construed liberally. We hold that the notice of appeal was timely filed, because it was filed within 60 days from the judgment of January 8, 1974.

II. WAS THERE SUBSTANTIAL EVIDENCE TO SUPPORT A FINDING OF RELIANCE BY PLAINTIFFS UPON ANY ALLEGED FRAUD, OR TO SUPPORT FINDINGS OF UNDUE INFLUENCE OR ECONOMIC COMPULSION COMMITTED BY APPELLANTS, AND SHOULD RESPONDENTS BE ESTOPPED FROM ASSERTING SUCH FRAUD OR COMPULSION?

Appellants argue that in this case there were in effect two separate transactions. The first was the original handwritten sales contract and management agreement. The second was the dismissal of appellants' suit for specific performance, and the execution of new escrow instructions and the second more liberal management contract. Moreover, appellants contend there is no substantial evidence in the record indicating that the second transaction was induced by fraud whatsoever, and that the second transaction was based upon a new agreement with different terms, and the first transaction was thus mutually rescinded and cancelled and any fraud in relation thereto became of no force and effect.

Appellants contend that respondents' initial pleadings essentially admit this argument. They cite paragraph XIV of respondents' complaint which states that between March 8, 1972, and March 23, 1972, plaintiffs initially refused to sign any escrow instructions and told defendants that they had changed their minds and felt they had been cheated. Therefore, appellants conclude, respondents' pleadings admit that before the second transaction took place respondents knew they had been defrauded, and could not have relied upon the fraud, and they must have waived and ratified the fraud and they should be estopped to contend the existence of the fraud under such circumstances.

Appellants also cite the record for the facts that before the escrow instructions and second management contract were signed the respondents had shown the original handwritten agreement to their son and daughter-in-law, who had warned the respondents to watch out; that

they had talked with their bookkeeper, Mrs. Roberts, who gave them additional warnings; that they wrote a letter seeking to change the agreement and obtain a life estate in two and one-half acres; that knowing these things they nevertheless signed the escrow instructions and deed and accepted a new and more liberal management contract with the understanding the specific performance suit would be dismissed; that they continued to work the property in conformance with the new management agreement; that Mr. Channell felt the document he signed was a fair deal after reading it; that Mr. Leach warned the Channells about the initial agreement; that for some time after the final agreements were completed the Channells made no complaints to the Anthonys, no demands for a trip to Texas, payment of their bills, or for commencement of suit against the Farmer's Home Administration.

Respondents' contention is that the theory upon which the case was tried to the jury was that this fraudulent scheme and plan was carried out over a period of several weeks, and the scheme ended only when the transaction was consummated by obtaining plaintiffs' signatures upon escrow instructions and a deed through the exercise of pressure, undue influence and economic compulsion through the wrongful lawsuit caused to be brought by defendants.

Respondents cite paragraph XV of their complaint which states that respondents would not have signed the escrow instructions and deed but for the appellants' fraud and "the threat, undue influence and compulsion of the specific performance action. . . ."

*Beason* v. *Griff* (1954) 127 Cal.App.2d 382 [274 P.2d 47], cited by both appellants and respondents, holds that a party who has been fraudulently induced into a conveyance can waive his right to rescind, if, after full discovery of the fraud, the party takes steps to affirm the transaction.

In *Schied* v. *Bodinson Mfg. Co.* (1947) 79 Cal.App.2d 134, 142-143 [179 P.2d 380], the court stated the rule: ". . . when a party claiming to have been defrauded, enters, after discovery of the fraud, into new arrangements or engagements concerning the subject-matter of the contract to which the fraud applies, he is deemed to have waived any claim for damages on account of the fraud." (Italics deleted.)

However, respondents correctly argue that there is no waiver of fraud when the acts constituting the waiver have themselves been induced by fraud. The rule is stated in *Holcomb* v. *Long Beach*

*Investment Co.* (1933) 129 Cal.App. 285, 292 [19 P.2d 31]: "It is true that a claim for damages for fraud may be waived by stipulation or conduct of the injured party subsequent to the discovery of the deceit, when he acts with full knowledge of the fraud. Under such circumstances the fraud may be waived by acquiescence or ratification of the transaction. [Citations.] Such purported release is, however, no defense to a subsequent suit for damages based upon the fraud when the instrument of release is also procured by fraud and lacks consideration."

Moreover, the doctrine of waiver depends upon a voluntary act (*Wienke* v. *Smith* (1918) 179 Cal. 220 [176 P. 42]), and acts committed under "undue influence" cannot constitute valid waivers (*Odorizzi* v. *Bloomfield School Dist.* (1966) 246 Cal.App.2d 123 [54 Cal.Rptr. 533]; *Keithley* v. *Civil Service Bd.* (1970) 11 Cal.App.3d 443 [89 Cal.Rptr. 809].)

■ There is substantial evidence in the record to support respondents' contentions of both a continuing fraud and undue influence. At the time appellants signed the escrow instructions and deed (second transaction), they were told by Anthony that he and Weber were going to keep their promise and that the Channells should trust them. They also told respondents that Mr. Channell would be paid to work on other ranches and that the new management agreement was necessary to get the transaction into escrow. Finally, Anthony told the Channells that he would take care of them. Mr. Channell worked under the second contract apparently because he felt if he did Anthony and Weber would be "fair" with him. All of these facts are consistent with a reasonable logical inference by the jury that at the time of the "second transaction" the Channells still hoped (buoyed by the further assurances of respondents) that the original promises of the respondents would still be carried out, and therefore, although they admittedly now entertained grave doubts as to appellants' truthfulness, they still were relying in part upon the original fraud.

■ Moreover, there is evidence that the signing of the escrow instructions and the deed were really not voluntary in that they were the product of undue influence. Undue influence is defined as: ". . . taking an unfair advantage of another's weakness of mind; or . . . taking a grossly oppressive and unfair advantage of another's necessities or distress." (Civ. Code, § 1575.)[1]

---

[1] "In essence, undue influence consists of the use of excessive pressure by a dominant person over a servient person resulting in the apparent will of the servient person being

In this case, when served with the suit for specific performance, according to Mrs. Channell's testimony, the Channells "went to pieces," "didn't know what to do," and didn't have the money to hire a lawyer. In the background was the constant threat of foreclosure. There is substantial evidence supporting a reasonable inference by the jury that the suit for specific performance was part of an intentionally fraudulent scheme and was not a legitimate action. It can be logically inferred from these facts that respondents only consummated the agreement in part because of their fear of the pending suit, and that under the circumstances, the signing was the product of undue influence.

We find there is substantial evidence to support a finding of reliance by plaintiffs upon the alleged fraud and to support findings of undue influence or economic compulsion on the part of appellants, and the evidence does not support appellants' claim that respondents should be estopped from asserting such fraud or compulsion.

### III Can the Appellants Properly Raise the Issues of Ratification, Waiver and Estoppel on Appeal?

Respondents argue that the appellants cannot raise the issues of ratification, waiver and estoppel because at no point in the proceedings in the trial court were the issues, theories or defenses of ratification, waiver or estoppel raised or mentioned in any way, and that new issues or new legal theories cannot be raised for the first time on appeal.

■ It is true that the cases hold that the facts constituting waiver and estoppel must be pleaded by the party who intends to rely upon them as

---

in fact the will of the dominant person. (*Odorizzi* v. *Bloomfield School Dist.* [(1966) 246 Cal.App.2d 123 (54 Cal.Rptr. 533)], at p. 131.)

"The undue susceptibility to such overpersuasive influence may be the product of physical or emotional exhaustion or anguish which results in one's inability to act with unencumbered volition. (*Odorizzi* v. *Bloomfield School Dist.*, *supra*, 246 Cal.App.2d 123, 131; see *Faulkner* v. *Beatty*, 161 Cal.App.2d 547, 551 [327 P.2d 41]; *Stewart* v. *Marvin*, *supra*, 139 Cal.App.2d 769, 775 [294 P.2d 114]; *Weger* v. *Rocha*, 138 Cal.App. 109, 114-115 [32 P.2d 417].) In any event, as observed in *Odorizzi*, overpersuasion is generally accompanied by certain characteristic elements which, when simultaneously present in a significant number, characterize the persuasion as excessive. These elements are '(1) discussion of the transaction at an unusual or inappropriate time, (2) consummation of the transaction in an unusual place, (3) insistent demand that the business be finished at once, (4) extreme emphasis on untoward consequences of delay, (5) the use of multiple persuaders by the dominant side against a single servient party, (6) absence of third-party advisers to the servient party, (7) statements that there is no time to consult financial advisers or attorneys.' (*Odorizzi* v. *Bloomfield School Dist.*, *supra*, at p. 133.)" (*Keithley* v. *Civil Service Bd.*, *supra*, at pp. 451-452.)

defenses (*Fair Oaks Bank* v. *Johnson* (1926) 198 Cal. 196 [244 P. 335]; *Williams* v. *Galloway* (1962) 211 Cal.App.2d 302 [27 Cal.Rptr. 438]), and appellants did indeed fail to allege such facts in their pleadings. However, it appears that appellants have in fact mislabeled their defenses. They appear to be arguing that by entering into a "second transaction" with new consideration the respondents thereby waived, and are estopped from asserting fraud. However, although labeled as "waiver" and "estoppel," the essence of this argument, in fact, is that there was no *reliance,* and it is not an estoppel or waiver argument at all. As such, appellants should not be barred from raising it on the grounds it was not affirmatively pleaded.

Waiver and estoppel are really arguments which go to facts which occur *after* an alleged fraudulent conveyance takes place. If the entire set of documents signed in this case are considered fraudulent (i.e., the first management contract, the handwritten sales contract, the deed and escrow instructions, the second management contract) then the only facts raised by appellants which might constitute a true waiver or estoppel are the facts that for several months the Channells continued to live on the ranch and work under the *second* management contract (accepting $100 a month). Since these facts constitute a true waiver or estoppel, appellants should be barred from using them for that purpose since they were not affirmatively pleaded. However, they may still be considered as relevant evidence on the question of whether or not there was in fact reliance. Reliance is one of the elements of fraud which must be affirmatively proved by a plaintiff alleging fraud. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 472, p. 2732.) As such, the issue was clearly before the jury (without it plaintiff could not have won) and more than sufficient evidence was directed to that specific issue.

IV. WAS THE GIVING OF SUBDIVISIONS (a)(2) AND (a)(3) OF CIVIL CODE SECTION 3343 IN JURY INSTRUCTION 27 PREJUDICIAL ERROR?

V. ARE SUBDIVISIONS (a)(2) AND (a)(3) OF CIVIL CODE SECTION 3343 UNCONSTITUTIONALLY VAGUE?

The above enumerated issues are sufficiently interwoven that the court will dispose of both issues in the same discussion.

In instructing the jury the trial court gave plaintiffs' instruction No. 27 reading as follows:

"PLAINTIFFS' INSTRUCTION NO. 27

"California Civil Code § 3343 provides in pertinent part as follows:

"(a) One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction, including any of the following:

". . . (2) An amount which would compensate the defrauded party for loss of use and enjoyment of the property to the extent that any such loss was proximately caused by the fraud.

"(3) Where the defrauded party has been induced by reason of the fraud to sell or otherwise part with the property in question, an amount which will compensate him for profits or other gains which might reasonably have been earned by use of the property had he retained it."

The effect of reading this instruction, with no limitations or explanations, was to give to the jury the precise wording of the statute covering the measure of damages in this case as the statute was amended in 1971.

Appellants concede that subdivision (a) above quoted was properly given to the jury, but contend that the giving of subdivision (a)(2) was "clear error" and that the giving of subdivision (a)(3) was not supported by the evidence and was likewise improper.

Appellants further attack subdivisions (a)(2) and (a)(3) of section 3343 as being unconstitutionally vague and uncertain and therefore, not enforceable. Basically, appellants claim that the challenged portions of the statute give no reasonable standard by which they can be applied. For example, appellants complain that the questioned sections of the statute provide for the defrauded party being compensated for *loss of use* and for *profits* which may have been reasonably earned by the property had it been retained, but leave unanswered the questions: For what period of time should this apply? Does it apply only from the time of the fraud to the time of the lawsuit? Can it be said to apply for a reasonable period projected in the future? Can it be said to apply in futuro forever? Hence, because the statute does not give the trier of the fact any period of time within which to compute these damages, appellants assert it is unconstitutionally vague.

As they apply to damages for fraud, subdivisions (a)(2) and (a)(3) of section 3343 are limited to recovery of damages by sellers of real property, while subdivision (a)(4) deals with *purchasers* of real property.[2]

The 1971 amendments to the statute, as they relate to *sellers,* and which are the target of appellants' complaints, have not heretofore been judicially construed by the courts of this state, and the question presents a case of first impression on that issue.

A review of the California law on the measure of damages for fraud seems necessary to an understanding of section 3343 as amended in 1971.

Before 1935 the California courts had no statutory mandate on the measure of damages for fraud. While the "benefit of the bargain" measure of damages was generally employed, on occasion California courts sometimes applied the "out of pocket" rule when the "loss of bargain" rule was difficult to apply or would work a hardship on plaintiff or defendant.[3]

---

[2]"3343. (a) One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction, including any of the following:

"(1) Amounts actually and reasonably expended in reliance upon the fraud.

" .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"(4) Where the defrauded party has been induced by reason of the fraud to purchase or otherwise acquire the property in question, an amount which will compensate him for any loss of profits or other gains which were reasonably anticipated and would have been earned by him from the use or sale of the property had it possessed the characteristics fraudulently attributed to it by the party committing the fraud, provided that lost profits from the use or sale of the property shall be recoverable only if and only to the extent that all of the following apply:

"(i)     The defrauded party acquired the property for the purpose of using or reselling it for a profit.

"(ii)     The defrauded party reasonably relied on the fraud in entering into the transaction and in anticipating profits from the subsequent use or sale of the property.

"(iii) Any loss of profits for which damages are sought under this paragraph have been proximately caused by the fraud and the defrauded party's reliance on it."

[3]Comment (1974) *Deceit Damages in California: Old Problem-New Departure?* 14 Santa Clara Law. 325. At pages 331-332 the author of the comment illustrates the difference in the two rules as follows: "Suppose the plaintiff pays $4,000 for the arid acreage falsely said to be benefitted by certain water rights which would make cultivation possible. The land without the water rights is worth only $100. The true value of the property with the alleged water rights would be $5,000. Under the 'out of pocket' rule the plaintiff would be entitled to the difference in value between what he gave ($4,000) and what he got ($100) or, $3,900. The 'loss of bargain' rule would allow recovery of the difference in value between the actual value of the property which the deceived buyer

In 1935 Civil Code section 3343 was enacted.[4]

As was pointed out in *Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744 [192. P.2d 935], since the enactment of section 3343 in 1935 all the California cases have either held or assumed that the statute prescribed the measure of damages to be applied to fraud cases in real estate sales to be the "out of pocket" measure. Writing for the majority, the then Chief Justice Gibson stated:

"We have been able to find no case, however, which has applied the benefit-of-the-bargain rule after section 3343 became operative. . . .

"In view of the broad, general language of section 3343 of the Civil Code and the uncertainty in the law that existed both here and elsewhere prior to the adoption of that section, it is reasonable to conclude that the statute was enacted to provide a uniform rule for all fraud cases, and we can see no reason for refusing to follow the decisions which have applied it as the exclusive measure of damages. . . .

"The provisions of section 3343 to the effect that the defrauded person may also recover any 'additional damage' arising from the particular transaction and that nothing in the statute shall be deemed to deny to such a person 'any legal or equitable remedies' to which he may be entitled, do not indicate that any other *measure of damages* may be applied. The right to recover *additional* damages does not refer to the *measure* of damages, but rather, to such matters as expenses or other consequential injury resulting from the fraud. [Citations.] The provision relating to other legal or equitable *remedies* likewise does not pertain to measure of damages, but, rather, it preserves such other remedies as the right to rescind or the right to recover on a warranty, if any. [Citation.] The construction which has been placed on section 3343 does not preclude the allowance of exemplary damages. [Citations.]"(*Bagdasarian v. Gragnon, supra,* 31 Cal.2d at pp. 762-763.)

---

received ($100) and the value it would have had had the water rights been available ($5,000) or, $4,900."

[4]Civil Code section 3343 (added by Stats. 1935, ch. 536, p. 1612)

"One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction.

"Nothing herein contained shall be deemed to deny any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled."

In a strong and well-reasoned dissent, Justice Schauer disagreed as to the exclusiveness of the remedy.[5]

In *Ward* v. *Taggart* (1959) 51 Cal.2d 736 [336 P.2d 534], then Associate Justice Traynor softened the harshness of the *Bagdasarian* rule. As noted in Comment, *Deceit Damages in California: Old Problem-New Departure?* 14 Santa Clara Law. 325 at pages 344-345:

"In *Ward,* an unprincipled real estate broker acquired some seventy-two thousand dollars in secret profits by falsely representing to plaintiff's broker that he, the defendant, had an exclusive listing for certain property and that plaintiff's initial offer to purchase this land had been rejected. In fact, defendant was not the vendor's exclusive agent, and plaintiff's initial bid was acceptable.

"The court recognized that the defendant had committed fraud but could not award 'out of pocket' damages because of an absence of relevant proof. Plaintiff did not establish that the $500 per acre he paid for the land exceeded its market value. Nor was there a fiduciary relationship, since negotiations were at arm's length between two real estate brokers. Justice Traynor resolved the dilemma by invoking principles of constructive trust, unjust enrichment, and quasi-contract in order to justify an award of both 'loss of bargain' and exemplary damages. *Ward,* in effect, reinterpreted section 3343 as *nonexclusive and admissible of exceptions.*"

---

[5]"I do not agree that the out-of-pocket loss rule is preferable to the benefit-of-the-bargain rule as a measure of damages in fraud-sale cases; nor do I agree that we are bound to hold that the purpose of enacting section 3343 (of the Civil Code) in 1935 was to substitute the out-of-pocket loss measure of damages for fraud in place of the former benefit-of-the-bargain rule.

"The statute as enacted specifically declares that 'Nothing herein contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled.' As I read the whole enactment, in the light of the language above quoted and the history of the bill in this state and similar measures elsewhere, we could justifiably hold that the purpose of the Legislature was not *prohibitively to substitute* the 'out-of-pocket' rule for the 'benefit-of-the-bargain' rule but, rather, *permissively to provide* an additional or alternative remedy or measure of damages which might be applied in proper cases.

"It seems reasonable to me to believe that the Legislature had purposed giving the defrauded victim greater protection; but the construction given the act by the majority opinion turns it into an act to protect the perpetrator rather than the victim of the fraud." (*Bagdasarian* v. *Gragnon, supra,* 31 Cal.2d at pp. 764-765.)

See also, Comment, *supra,* footnote 3, 14 Santa Clara Law. 325 at page 341: "The position of Justice Schauer in *Bagdasarian* was sound. The carefully chosen language of the statute indicates that the legislature intended section 3343 to permit an 'out of pocket' award when, in the court's discretion, this was advisable."

The introduction of anticipated revenue or profit as an element of allowable damages under section 3343 came in *Eatwell* v. *Beck* (1953) 41 Cal.2d 128 [257 P.2d 643], a case in which an elderly couple and their children invested their entire savings in a 10-unit motel property which they intended to occupy and use as a home and business. Defendants misrepresented the monthly income and expenses of the business and the plaintiffs lost the property through foreclosure. They were nonsuited for failure to prove damages under the "out of pocket" rule of section 3343. The Supreme Court of California reversed the judgment in an opinion by Justice Schauer, the opinion holding that anticipated revenue from the motel was an element to be considered in determining its actual or market value for purposes of the "out of pocket" rule and that the trial court erred in excluding such evidence.

With glaring inconsistency, California's statutory structure before 1971 permitted recovery of lost profits and earnings under Civil Code section 3333 in fraud cases which did not concern the "purchase, sale or exchange of property," and even in simple negligence cases (Civ. Code, § 3333) and breach of contract cases (Civ. Code, § 3300) the injured parties could recover lost profits and earnings, while the "out of pocket" rule barred the fraud victim in property transaction cases from recovering more than the difference between the amount he paid for the property and its actual value.[6]

The 1971 amendment to section 3343[7] took the form of an *addition* to the "out of pocket" rule. The statute had previously permitted recovery of "additional damages," but the 1971 amendment enumerated specific types of consequential damages which are included within the term "additional damages." In the case of a seller, as in the case before the court, the defrauded victim is entitled to recover not only the difference between the actual value of that with which he parted and the actual value of that which he received (out-of-pocket) but also *any* additional damage arising from the particular transaction *including* any of the following: 1. amounts expended in reliance upon the fraud; 2. amounts compensating for loss of use and enjoyment of the property due to the fraud; and 3. an amount which would compensate him for the profits or other gains by the use of the property had he retained it. (Civ. Code, § 3343, subd. (a)(1), (2), (3).)

---

[6]See Comment, *Deceit Damages in California: Old Problem-New Departure?* 14 Santa Clara Law. 325, at pages 344-347.

[7]Statutes 1971, chapter 943, page 1850.

But, at the same time, the Legislature clearly ruled out by the 1971 amendment any recovery of damages for fraud measured by the traditional "loss of bargain" formula.[8]

At the time the questioned instruction was given in the case before the court there had been no formal instruction on damages in a fraud case prepared by the Committee on Standard Jury Instructions, Civil (BAJI). Since the trial in the instant case that committee has formulated an instruction (No. 12.56) in the pocket supplement to California Jury Instructions—Civil (BAJI) which bears the caption "FRAUD AND DECEIT—DAMAGES—OUT OF POCKET RULE" and reads in part as follows:

"If, under the court's instructions, you find that plaintiff is entitled to a verdict against defendant, you must then award plaintiff damages, if any, proximately caused by the fraud upon which you base your finding of liability.

The amount of such award shall include:

1. The difference, if any, between the actual value of that with which the plaintiff parted and the actual value of that which he received. This is sometimes referred to as the 'out of pocket loss.'

Actual value means market value. . . . (Here follows a definition of market value.)

2. In addition to his 'out of pocket loss,' if any, plaintiff is entitled to recover any additional damage arising from the particular transaction, including any of the following:

    a. [Amounts actually and reasonably expended in reliance upon the fraud.]

    b. [An amount which would compensate the plaintiff for loss of use and enjoyment of the property to the extent that any such loss was proximately caused by the fraud.]

---

[8]Civil Code section 3343:

"3343 . . . . (b) Nothing in this section shall do either of the following:

"(1) Permit the defrauded person to recover any amount measured by the difference between the value of property as represented and the actual value thereof.

"(2) Deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled."

c. [An amount which will compensate him for profits or other gains which might reasonably have been earned by use of the property had he retained it.]"[9]

It will be noted that in BAJI No. 12.56, in breaking down what may be included under the reference to "any additional damage" (i.e., in addition to the out-of-pocket loss), the instruction specifically brackets those items based on subdivision (a)(1), (2) and (3) of Civil Code section 3343: (1) amounts reasonably expended in reliance upon the fraud; (2) compensation for loss of use and enjoyment of the property to the extent proximately caused by the fraud; and (3) compensation for loss of profits or other gains which might reasonably have been earned by use of the property had the seller retained it.

The use of the brackets is a clear indication that the Committee on Standard Instructions which authored BAJI No. 12.56 intended that in using such instruction the trial court would "tailor" the instruction to fit the facts and evidence in the particular case and not give the whole instruction where certain portions of it were clearly inapplicable to the facts developed by the evidence at the trial.[10]

In the case before the court the respondents elected to dismiss their cause of action for rescission and recover damages under section 3343. By this action respondents recognized that title legally passed to appellants upon the close of the escrow. This election entitled respondents to their "out of pocket" loss under section 3343, i.e., the difference between what they received for their property and the fair market value of same at the time of the transfer. (*Bagdasarian* v. *Gragnon, supra,* 31 Cal.2d 744.) Under section 3343 they were also entitled to "any other damages" which might be considered consequential damages proximate-

---

[9]This court has omitted subdivision 2 d.(i), (ii) and (iii), which cover cases in which the plaintiff has *purchased* or otherwise *acquired* the property in question.

A separate instruction, BAJI No. 12.57, applies to the "benefit of the bargain" rule.

BAJI No. 12.56, quoted above, applies to fraud cases involving the purchase, sale or exchange of property, real or personal. "An exception to this rule exists where the defrauding party . . . stands in a fiduciary relationship to the defrauded party in which case the 'benefit of the bargain' rule under Civil Code sections 1709 and 333 applies." (Cal. Jury Instns., Civ. (5th ed. 1969) 1975 Cumulative Pocket Part, Use Note, p. 130.)

[10]California Jury Instructions—Civil (5th ed. 1969) Preface, page XV: "Many instructions contain bracketed material which generally present alternatives, one of which is to be chosen and the other or others stricken. In other instances, brackets contain optional material which may or may not be applicable, depending upon the particular case and the posture of the evidence. Care must be used to strike material not applicable to the case on trial."

ly caused by the fraud, such as any amounts of money they might have expended in reliance upon the fraud. But respondents had no right to the use and enjoyment of the property except such as were created by the contract. Likewise, they had no right to any gains or profits which the property might earn, except as created by the contract.

There is substantial evidence to support a finding by the jury that the fair market value of the property at the time of the transfer was $56,100. Appellants assumed the Channells' FHA loan, county property taxes, irrigation district taxes, a packing house encumbrance, and made other expenditures relieving the Channells from their obligations and debts, all of which aggregated $36,929.69, which the parties agree is the amount appellants paid for the property. The difference between the amount paid by appellants and the fair market value is $19,170.31. This clearly represents the out-of-pocket loss under the established rules discussed herein. The jury awarded respondents compensatory damages in the sum of $25,000, or an amount $5,829.69 in excess of the established out-of-pocket damages.

To be permitted to stand, such additional amount of damages must have been actually sustained and cannot be based on surmise or conjecture. (*O'Neil* v. *Spillane* (1975) 45 Cal.App.3d 147 [119 Cal.Rptr. 245].) ■ Mental distress is not an element of damages allowable under Civil Code section 3343. (*Sierra Nat. Bank* v. *Brown* (1971) 18 Cal.App.3d 98 [95 Cal.Rptr. 742]; *O'Neil* v. *Spillane, supra.*)

There was no evidence showing any amounts of money expended by respondents in reliance upon the fraud. By electing to drop their rescission cause of action respondents gave up any right to claim loss of profits, except as such right was created by the final agreement (10 percent of any net income in excess of $15,000 in any year.) Substantial evidence supports appellants' claim that they made no such profit, and in fact that they lost money on the first year's operation after taking title.

There was substantial evidence in the record that the fair rental value of respondents' home upon the ranch was $100 per month. A period of 18 months passed between the time of the fraudulent transaction until the trial. Having passed title at the close of escrow respondents had no right to the use of any part of the property except as created by the agreement. The final agreement provided that respondents could remain in the occupancy of the home, rent free, but they were evicted by an

unlawful detainer brought by appellants and lost occupancy of the home in early August 1972. From the evidence the jury could have found that the eviction of respondents from the home was not justified and that they were deprived of the use of the home from the time of the eviction until the trial, a period of 14 months respondents were wrongfully deprived of a use of the property to which they were entitled under the final contract.[11] For this loss of use, computed at the reasonable figure of $100 per month, respondent would have suffered an additional $1,400 damages properly allowable within the scope of Civil Code section 3343. This is approximately $4,400 short of the additional damages of $5,800 found by the jury.

The first management agreement provided that the Channells could live in the home on the property, rent free, in exchange for Mr. Channell's services in maintenance of the ranch for a period of 10 years. This was superseded by the final management agreement under which Mr. Channell was hired as foreman at a salary of $25 per week and was to receive 10 percent of any net profits in excess of $15,000 each year. Under provision 4 of the final agreement it was also provided that the Channells could continue to reside in the home on the premises as part of the consideration for his services to be performed. Provision 9 of the final agreement provided that the agreement "is automatically renewed each year for a period of 10 years, providing all terms and conditions are satisfactorily performed by the parties hereto."

By their eviction and ouster of the Channells from the premises, appellants made it impossible for the Channells to perform any further and not only deprived them of the use of that portion of the premises to the time of trial, but also for a possible additional eight and one-half years in the future under the renewal clause. At $100 per month, this loss of use alone would amount to $10,200, or considerably in excess of the $5,800 figure over and above the normal out-of-pocket loss.

But for the management clause, the renewal clause and the 10 percent of the net profits above $15,000 clause, the respondents would have had no right to the use of the property or to any claim of profits from the property, and it would have been erroneous for the trial court to have read to the jury subdivisions (a)(2) and (a)(3) of Civil Code section

[11]A period of approximately four months actually intervened between the signing of the final agreement and the ouster by the unlawful detainer action. However, Channells admitted to having been paid $100 per month for some of the months involved, and also to actually occupying and having the use of the home for the same period of time.

3343. Since the contract itself created a right to use and a right to profits, notwithstanding the fact that title passed, it was proper to instruct the jury on those two elements of damage and let the jury determine from the facts whether the conditions creating such damages did or did not exist, and if they did exist, the amount of damages for violations of the rights so created.

■ Appellants' objections to subdivisions (a)(2) and (a)(3) as being unconstitutionally vague are without merit if the statute is viewed in the light it was viewed by the committee drafting the civil jury instructions (BAJI No. 12.45.) If the seller parts with title and elects to forego his right of rescission and sue for damages only, then of course subdivisions (a)(2) and (a)(3) of section 3343 do not apply and should not be given by the trial court (unless, as here, the contract itself creates such rights). In each case in which a seller of property is defrauded by a buyer, the trial court will have to examine the circumstances of the particular case and decide whether the questioned portions of section 3343 do or do not apply. The present case is a fine example of when they do apply. Another might be where the seller retains his right of rescission, in which event the trial court would be justified to give an instruction including the challenged portions of the statute, tailoring the instruction to indicate whether applicable to use or profits or both, and if either, the time span to be considered. What that time span should be would be determined by the peculiar circumstances of the particular case before the court and should present no insurmountable difficulty for a court in fixing a reasonable period contemplated by the statute.[12]

In any event, in the case before the court, the agreement itself fixes the time span within which the jury could have found respondents suffered from loss of use at the rate of $100 per month. The fact they found less than they could have found is no grounds for complaint by appellants. Where the fact of damage is clear, the trier of the fact is permitted a reasonable approximation in determining the amount. (*Hartong* v. *Partake, Inc.* (1968) 266 Cal.App.2d 942 [72 Cal.Rptr. 722].)

---

[12]Comment, *Deceit Damages in California: Old Problem-New Departure?* 14 Santa Clara Law. 325, 351-352:

"While it generally happens that it is the seller of property who misleads the buyer, sometimes the buyer defrauds the seller. . . .

". . . . . . . . . . . . . . . .

"Interpretation of the provision for 'lost profits' or 'other gains' will involve interesting questions of statutory interpretation."

We hold that under the circumstances and facts of the case before the court it was not error to give subdivisions (a)(2) and (a)(3) of Civil Code section 3343 as a part of Instruction No. 27 to the jury. We further hold that subdivisions (a)(2) and (a)(3) of Civil Code section 3343 are neither unconstitutionally vague nor uncertain.

## VI. CAN APPELLANTS CLAIM ON APPEAL THE INSTRUCTIONS WERE IN ERROR?

Respondents contend that since appellants did not object in the court below to the giving of plaintiffs' Instruction No. 27, they cannot now object to the instruction for the first time on appeal. They also argue that since appellants themselves submitted a similar instruction based on Civil Code section 3343, they are barred by the doctrine of "invited error" from objecting to the instruction as it pertained to damages for loss of use and enjoyment. (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 243, p. 3057.)

Taking up the latter point first, it is true that appellants did request a jury instruction in the language of section 3343 subdivision (a)(3) (allowing lost profits), but appellants did not request a jury instruction in the language of section 3343 subdivision (a)(2) (allowing for loss of use and enjoyment). Therefore, if barred by the doctrine of invited error, (4 Witkin, Cal. Procedure, *supra*; *Hughes* v. *Pacific Electric Ry. Co.* (1922) 58 Cal.App. 375, 380 [208 P. 335]) appellants should not be barred from objecting to the instruction as it pertained to damages for loss of use and enjoyment.

Under Code of Civil Procedure section 647, if the instruction is erroneous, a party need not object to it at trial in order to raise the legal question on appeal. However, if the error was one of omission and the instruction could have been corrected by objection at trial, failure to do so would have constituted a waiver of the right to object on appeal. (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 194, p. 3013.)

In the light of the full discussion by this court contained in the foregoing pages under issues IV and V, the question raised above in issue No. VI appears clearly now to be moot.

## VII. Were Compensatory Damages Improperly Calculated?

As indicated in the discussion in the foregoing pages under issues IV and V above, the fair market value of the property was $56,100 (the highest value testified to by respondents' expert appraiser). It is not disputed that appellants paid $36,929.69 for the property. The difference of $19,170.31 represented the classical out-of-pocket loss to respondents. The jury, however, awarded respondents compensatory damages of $25,000.

The appellants argue that no losses for use or profits should be allowed, because title passed at the time of the closing of escrow and respondents had no *right* of use and no *right* to profits. They concede that perhaps the respondents might have been deprived of 18 months use of the home which had a reasonable rental value of $100 and that even allowing such $1,800 additional damages, the verdict was still over $4,000 in excess of any damages supported by evidence.

In the lengthy discussion under issues IV and V in the foregoing pages this court has indicated that the contract written by appellants themselves established a *right* to use of the home and *right* to profits under certain conditions. Conceding that the conditions relating to profits did not occur, the covenant relating to the use of the home was independent of that provision and granted to respondents the right to stay on and live in the home, renewable yearly for 10 years if the terms and conditions were satisfactorily performed. This had a potential use value of $1,200 per year for ten years or $12,000, of which five months (Apr., May, June, July and Aug., or $500) were occupied and the use received by respondents, leaving a potential use value of $11,500 at the time of respondents' eviction.

The jury in this case obviously believed respondents' evidence and from the evidence could have found that the eviction was unjustified. The figure of $5,829.69 given by the jury in excess of the conventional out-of-pocket damages were well within the allowable additional figure of $11,500 and appellants cannot be heard to complain because the damages were less than those which could have been granted.

## VIII. WERE PUNITIVE DAMAGES IMPROPERLY AWARDED?

Appellants' contention that punitive damages were improperly awarded is based upon the proposition that there can be no award of punitive damages without a valid award of compensable damages and that there was no valid award of compensable damages in this case.

The contention is without merit. As indicated in the discussion in the foregoing pages, there was a valid award of compensable damages. An award of punitive damages is permissible under Civil Code section 3343. (*Ward* v. *Taggart, supra,* 51 Cal.2d 736.)

The judgment is affirmed.

Gargano, Acting P. J., and Franson, J., concurred.