STATE v. RICHARD WILSON GAGE.

136 N. W. (2d) 662.

August 13, 1965—No. 39,424.

*Richard B. Ryan,* for appellant.

*Robert W. Mattson,* Attorney General, and *William B. Randall,* County Attorney, for respondent.

ROGOSHESKE, JUSTICE.

Defendant, a branch manager of a magazine sales company, was convicted of larceny in the second degree upon an indictment accusing him of stealing from and out of the building of a printing company "[p]rinted daily addenda telephone sheets of some value," property of the publishing company, printed for the telephone company and discarded during the printing process as part of the spoilage or "overrun." He was sentenced to pay a fine of $500 and he appeals from the judgment of conviction.

When defendant was arrested on August 29, 1963, he was 32 years old, unmarried, and the branch manager of Family Publication Service, a corporation owned by Life and Time, Incorporated, and engaged in selling national magazines. Previously, from June 1955 to May 1963, he had worked for various magazine subscription agencies and had been branch manager of the Ben Franklin Reading Club. The branch which he supervised in August 1963 covered a territory extending from central Wisconsin west to Idaho, and from Canada south to the middle of Iowa. It had 81 employees, about 33 of whom were engaged in sales, mainly by telephone solicitation. To carry on such sales, the branch paid the telephone company about $1,500 monthly for telephone services, which included the lease of a special street directory for Minneapolis and St. Paul published by the telephone company semiannually.

In August 1962, a year previous to his arrest, when he was branch manager of the Ben Franklin Reading Club, defendant learned from one of his employees that the telephone company has printed and distributed daily to its exchanges a list of new and changed numbers called the "daily addenda" or "green sheets." These lists supplement the directory now published annually by the telephone company and are used to enable the "information group" to advise callers of a subscriber's current telephone

number. He attempted to obtain the daily addenda from the telephone company but was told it did not sell or furnish such service. When he inquired why, he was told by a secretary, "Well, probably, just probably financially impractical." The testimony from a telephone company official was that it was company policy not to furnish the service, even though many sought to buy it, because the annoyance to subscribers caused by telephone solicitation on moving days outweighed any profit from the sale of the service. Defendant was told by the telephone company, upon his inquiry, that Webb Publishing Company printed the daily addenda. He inquired of Webb by telephone and was told that the lists were not for sale by it but that he should talk to the telephone company. Later, another of his employees told him that she knew a girl who worked at Webb. He went to that girl and asked if there were any proof copies of the sheets that were thrown away. She said that she didn't know, but he should call Mr. Bergeson. Defendant did so and made an appointment to see him.

Bergeson had been a pressman at Webb for 16 years. At the time of the meeting in his West St. Paul home in October 1962, he operated the offset press on which the daily addenda were printed. Defendant misrepresented himself to Bergeson as an insurance salesman who was having difficulty in making contacts. He felt that the magazine solicitation business carried a disreputable connotation and the less said about it the better. The two men engaged in small talk for a bit; then, after Bergeson had described his job, defendant ventured to ask whether he could "possibly maybe get some sheets for him, sheets that weren't any good." Bergeson told him that he "thought [he] could, but [he] said, although [he] didn't know what possible good they would be because the numbers themselves could be obtained from the operator or could be obtained right out of the regular telephone book."

Bergeson nevertheless obtained some copies for defendant. These were satisfactory, and defendant paid Bergeson $100 for October and $75 a month thereafter for delivering the discarded copies. Bergeson first supplied the copies personally, but later, because he worked nights and defendant wanted them early in the morning, placed them in a rural mailbox at the curbside of his home, where defendant picked them up. Bergeson made no attempt to conceal his activities at the plant or at home. His

neighbors, wife, and family knew of the arrangement, and his wife on occasion accepted payment from defendant. All of the sheets supplied came from a wastepaper or a trash receptacle located near the press. The sheets supplied were either deficient tests resulting when the machine was started, or overrun sheets. Bergeson never printed sheets expressly for defendant, and on the few occasions when there were no discards, no sheets were supplied. Bergeson was never told, as he was on some security printing jobs, that he had to account for the spoilage. He knew that the wastepaper was baled and picked up by the Waldorf Paper Products Company although defendant did not, and neither of them knew that Waldorf paid Webb $7 a ton for the wastepaper.

Defendant often took a circuitous route to Bergeson's house for the purpose of evading competitors, one of whom he discovered following him on one occasion, but otherwise he made no attempt to conceal his activities. Once the telephone investigator passed him on the sidewalk and saw the characteristically green addenda protruding from his pocket. Telephone repairmen were in defendant's calling room on the average of once a month, and the green sheets were kept in full view. Defendant stated that he once consulted a sheet with a repairman whom he had questioned concerning how telephone numbers are assigned.

Soon after defendant began using the sheets with the Ben Franklin Reading Club, the telephone company received its first complaints from subscribers. Raymond Buechner, a security supervisor for the telephone company, investigated the matter and began following defendant to learn how he was securing the daily addenda. He soon discovered that they were being supplied by someone in West St. Paul. Several days before August 29, 1963, Buechner asked for two additional telephone security men to tail defendant. They stationed themselves near the Bergeson house, observed defendant through binoculars, and attempted to take pictures of him. During the period of this extensive surveillance, Buechner at no time spoke to Bergeson or defendant, nor did either the telephone company or Webb attempt in any way to put a stop to their activities or even make known that the wastepaper was baled and sold.

On August 29, after Buechner enlisted the aid of his father, a detective on the St. Paul police force, the two men stopped defendant returning from

Bergeson's home by pulling him over with a siren in an unmarked police car. The detective walked up to defendant, identified himself, and read a search warrant to search the car. He saw what looked like green pages of a telephone directory and asked defendant what they were. Although he didn't clearly recall defendant's answer, he believed defendant said, "They're books or directories." Defendant declined to further discuss the green sheets, 18 of which were found in the car, until he talked to an attorney. Those sheets had been procured from the wastebasket by Bergeson, as he was not then running the press upon which they were printed.

Much of the evidence in this case and most of the efforts of the prosecution were directed to prove that defendant was guilty of stealing secret information belonging to the telephone company which he knew was otherwise unavailable. This evidence was a great deal broader than the narrow charge for which defendant was tried and therein lies the vice of his conviction.

We are not faced with the question whether the information contained on the daily addenda could have been the subject of larceny under our criminal statutes prior to the Criminal Code of 1963. An accused can be convicted only of the crime with which he is charged.[1] The indictment before us charged only the crime of stealing wastepaper from the Webb Publishing Company.[2] And we assume, for the purposes of this opinion, that the infinitesimal value—7/10 of one mill—of the 18 sheets of wastepaper, computed on the price of $7 a ton, is sufficient to constitute personal property of "any value" within the meaning of Minn. St. 622.06.

The crucial issue is whether there was sufficient evidence upon which

---

[1] Minn. St. 628.10; State v. Wurdemann, 265 Minn. 92, 120 N. W. (2d) 317.

[2] Defendant was charged as a principal under Minn. St. 610.12 with having committed second-degree grand larceny in contravention of Minn. St. 622.06(3), which provides: "Every person who * * * steals or unlawfully obtains or appropriates:

* * * * * *

"(3) Property of any value by taking it in the daytime from any * * * building * * *." Cf. People v. Dolbeer, 214 Cal. App. (2d) 619, 29 Cal. Rptr. 573, where defendant and another induced an employee of a printing company to make available the telephone company daily addenda for copying, and his conviction for a conspiracy to commit embezzlement was upheld.

the jury could find that defendant possessed the necessary element of criminal intent to steal wastepaper. It is elementary that to commit larceny one must take the property of another with the intent to permanently deprive the owner of the property taken.[3] This intent is lacking and the defendant is not guilty of larceny if he has taken the property with the reasonable and actual belief that it was abandoned.[4]

We are convinced not only that the state failed to prove criminal intent but that the evidence that defendant believed the sheets to be abandoned is clear and convincing. The state did not prove any circumstances tending to show that defendant knew that Webb had an interest in the sheets taken. Although he readily admitted, and by his payments to Bergeson unequivocally demonstrated, that the information printed on the sheets was of benefit to him, he repeatedly denied knowing of the salvage value of the wastepaper or of its accustomed sale to Waldorf. Bergeson also denied knowing of any salvage value, and the open and obvious actions of both men when taking and transferring the sheets imply that they felt they were not taking any property from Webb.

We are aware of cases holding that wastepaper can be a subject of larceny.[5] In those cases, however, the paper had been placed along the street for collection by a civic organization and was therefore not abandoned. In this case, the evidence establishes that defendant was clearly justified in his declared belief that the paper discarded into trash receptacles was abandoned by Webb, the same as if the printing thereon was illegible or the sheets blank. If such had been taken by defendant the indictment and the court instructions would have permitted a finding of guilt but the insufficiency of the evidence to prove criminal intent would be more demonstrable. Although defendant's claimed misconduct may well justify other civil or criminal sanctions, the evidence establishes that he actually and reasonably believed that the sheets were abandoned and his conviction for

---

[3] 11 Dunnell, Dig. (3 ed.) § 5487; 2 Wharton, Criminal Law and Procedure, § 452.

[4] Morissette v. United States, 342 U. S. 246, 72 S. Ct. 240, 96 L. ed. 288; 2 Wharton, Criminal Law and Procedure, § 493.

[5] E. g., State v. Weinstein, 224 N. C. 645, 31 S. E. (2d) 920, 156 A. L. R. 625, certiorari denied, 324 U. S. 849, 65 S. Ct. 689, 89 L. ed. 1410.

stealing them from Webb cannot be upheld. Accordingly, he is entitled to be discharged.

Reversed.

Mr. Justice Murphy took no part in the consideration or decision of this case.