[Civ. No. 14694. Fourth Dist., Div. One. Mar. 18, 1977.]

DAVID HARTMAN, Plaintiff and Respondent, v.
SHELL OIL COMPANY, Defendant and Appellant.

**COUNSEL**

Keltner & Schreiber, Donald H. Keltner and Edwin C. Schreiber for Defendant and Appellant.

Greer, Popko, Miller & Foerster and James H. Miller for Plaintiff and Respondent.

**OPINION**

**STANIFORTH, J.**—Plaintiff Hartman was induced by false representations, made to him by Donald McFarlin, to purchase a Shell Oil station located on the southeast corner of the intersection of Pomerado and Poway Roads in Poway, California.

McFarlin told Hartman he was the only Shell employee Hartman was supposed to deal with. He said, "As far as you are concerned, I am Shell Oil Company." In response to Hartman's expressed concern about the age and small size of the station contemplated to be purchased, McFarlin

told Hartman, Shell Oil Company would either expand the old existing Shell Oil station or, if Shell Oil Company was able to buy the new American Oil station across the street (on the southwest corner of the intersection of Pomerado and Poway Roads) Hartman would be transferred into this new station. In reliance upon these representations, Hartman executed defendant's [Shell Oil Company's] form, a dealer's agreement, dealer's lease and promissory note, thereby purchasing the Shell station. Hartman then gave up his position with the San Diego Sheriff's office, took possession of the "old" Shell station, and worked diligently to build up the business.

In June 1972 Hartman learned Shell Oil Company was to obtain the previously discussed new American Oil station. Hartman was informed by McFarlin and his superior in Shell Oil Company, Frank Hoak, that the American Oil station would be converted to a Shell station, but that Hartman would not be allowed to operate it for the reason that Shell Oil Company had made an informal oral agreement with American Oil Company in connection with its purchase of several American Oil stations to retain the existing dealers. The American Oil station was acquired by Shell and converted into a Shell Oil station. The opening of a competitive, new, large Shell station immediately across the street from plaintiff's station caused the older, smaller Shell station to become economically untenable. Hartman negotiated a reduced rental on his lease with Shell and then, in an attempt to mitigate his damage further, acquired the Standard Oil station on the northeast corner of the intersection of Pomerado and Poway Roads. Further negotiations failed, whereupon plaintiff brought suit. Upon trial before a jury he was nonsuited on all but his fourth cause of action, allowed to amend his complaint, and on this state of the pleadings the case went to the jury. The jury returned a plaintiff's verdict of $20,000 general damages and $15,000 punitive damages. From the judgment thereon Shell Oil Company appeals.

Shell Oil Company contends the jury was improperly instructed when they were told to award damages to Hartman based upon "profits that plaintiff would have realized if he had been allowed to operate the American Oil station turned into a Shell station." This, says Shell, is a "benefit of the bargain instruction," not authorized by Civil Code section 3343. To establish this legal premise Shell cited *Empire West* v. *Southern California Gas Co.,* 12 Cal.3d 805, 810 [117 Cal.Rptr. 423, 528 P.2d 31]; *O'Neil* v. *Spillane,* 45 Cal.App.3d 147, 159 [119 Cal.Rptr. 245]; *Ford* v. *Cournale,* 36 Cal.App.3d 172, 183-184 [111 Cal.Rptr. 334]; and *Pepper* v.

*Underwood,* 48 Cal.App.3d 698 [122 Cal.Rptr. 343]. *O'Neil* v. *Spillane, supra,* observes, at page 159: "It is likewise settled beyond dispute that under section 3343 the measure of damages for the fraudulent purchase, sale or exchange of property is the out-of-pocket loss of the defrauded party . . . ." *Empire West* v. *Southern California Gas Co., supra,* 12 Cal.3d 805, 811, footnote 2, cautiously says: "[O]rdinarily damages for fraud are limited to out-of-pocket loss."

The difficulty, from Shell Oil Company's point of view, with the cited cases is that none holds expressly or by implication that loss of profits is by definition a "benefit of the bargain" measure of damages as Shell contends. Therefore there is a slip in defendant's syllogism. Further, none of the cited cases deals with loss of profits resulting from a fraudulently induced real estate transaction. Therefore they are not in point. The fountainhead—the source of Shell Oil Company's contention —is *Bagdasarian* v. *Gragnon,* 31 Cal.2d 744, 762 [192 P.2d 935], which involved a claim for damages induced by fraudulent representations to buy a farm. Chief Justice Gibson there stated: "Thus, it was squarely held that, after the enactment of section 3343, a person who has been defrauded may no longer recover the difference between the actual value of the property received and the value it was represented to have." From this language the general principle flowed. A trial court could award "only out-of-pocket" losses in fixing damages under Civil Code section 3343. *Bagdasarian, supra,* received a legally mixed welcome. Its general rule, as Shell documents, is often cited with approval. However, wherever the general rule has been attempted to be applied where loss of profits or other damages appear as the proximate result of a fraudulent real property transaction, a different rule emerges. *Ward* v. *Taggart,* 51 Cal.2d 736, 740 [336 P.2d 534], cites the *Bagdasarian* general premise: "Since there was no proof that plaintiffs suffered 'out-of-pocket' loss, there can be no recovery in tort for fraud." The court in *Taggart* also said, at page 741: "Even though Taggart was not plaintiff's agent, the public policy of this state does not permit one to 'take advantage of his own wrong' (Civ. Code, § 3517), and the law provides a quasi-contractual remedy to prevent one from being unjustly enriched at the expense of another. Section 2224 of the Civil Code provides that one 'who gains a thing by fraud . . . or other wrongful act, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.' As a real estate broker, Taggart had the duty to be honest and truthful in his dealings. [Citations.] The evidence is clearly sufficient to support a finding that Taggart violated this duty. Through fraudulent misrepresen-

tations he received money that plaintiffs would otherwise have had. Thus, Taggart is an involuntary trustee for the benefit of plaintiffs on the secret profit of $1,000 per acre that he made from his dealings with them." Just what the *Taggart* case did to the *Bagdasarian* holding is sharply brought into focus in Justice Schauer's concurring and dissenting opinion, where he said: "[T]his decision, by its ingenious innovation and application of a constructive trust-unjust enrichment-quasi-contractual theory to support an award of exemplary damages as against one of the defendants, avoids much of the evil effect of the majority holding in *Bagdasarian* v. *Gragnon*." (51 Cal.2d at p. 744.) Continuing, Justice Schauer said, on page 745: "It was my view then, and still is, that section 3343 was intended by the Legislature to provide an alternative, not the exclusive, measure of damages in such cases.

"As pointed out by Professor Williston, under the construction of the statute adopted by the majority in the Bagdasarian case, 'a fraudulent person can in no event lose anything by his fraud. He runs the chance of making a profit if he successfully carries out his plan and is not afterward brought to account for it; and if he is brought to account, he at least will lose nothing by his misconduct.' (5 Williston on Contracts (rev. ed.), 3886, § 1392.)" And finally, Justice Schauer pointedly directs attention to certain clear language of then Civil Code section 3343:

"[It] expressly declares that 'Nothing herein contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled.' " (51 Cal.2d at p. 745.)

   *Taggart* was followed by *Lawson* v. *Town & Country Shops, Inc.,* 159 Cal.App.2d 196 [323 P.2d 843]. In *Lawson,* at page 203, the court took note of that part of Civil Code section 3343 quoted by Justice Schauer, and in application thereof cited and applied Civil Code section 1709, which provides: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Thus the *Lawson* court allowed as the measure of damages for fraud under Civil Code section 3343 such items as consequential damages for permanent improvements, operating loss, loss of profits and a sum for punitive damages. *Sixta* v. *Ochsner,* 187 Cal.App.2d 485, 491 [9 Cal.Rptr. 617], cites *Lawson* as authorizing these species of damages pursuant to section 3343, and continues further: "In fact, '[s]ection 3343 permits the recovery . . . of any . . . loss arising from the transaction,' " citing *Williams* v. *Graham,* 83 Cal.App.2d 649, 653

[189 P.2d 324]. In *Coleman v. Ladd Ford Co.*, 215 Cal.App.2d 90, 93-94 [29 Cal.Rptr. 832], Justice Burke gave the "out-of-pocket" rule as expressed in *Bagdasarian, supra,* a long analytic view, and expressed judicial disfavor, saying:

"Under the decision in *Bagdasarian v. Gragnon, supra,* 31 Cal.2d 744, the plaintiff may recover only that which he is actually out-of-pocket, i.e., the difference, if any, between what the property is actually worth and the price he paid for it. . . . But the rigidity of this rule has been relaxed. In *Ward* v. *Taggart, supra,* 51 Cal.2d 736, the Supreme Court opened the door for such further court interpretation of the section as may be necessary to do justice.

"The problems solved by *Ward* v. *Taggart, supra,* conduce to a retention of the theory therein adopted—a theory neither pleaded nor raised by the parties, but evolved by the court to apply under the circumstances presented in the case in order to do justice which under the application of the exclusive test previously announced in *Bagdasarian* would have been impossible. . . .

"Its effect was not to overrule *Bagdasarian* but to interpret that ruling as being permissive of exceptions. *Ward* v. *Taggart, supra,* affords justice to litigants who would be otherwise denied relief. It also preserves punitive damages as a strong deterrent to unacceptable conduct by defrauding parties. The decision indicates a proper base in law or equity for each aspect of the multiple theory adopted.

"Most persuasive against the purportedly restrictive rule set forth in *Bagdasarian,* that 'out-of-pocket' loss should be the exclusive measure of damages, is the statement in 5 Williston, Contracts, section 1392, referring to such rule: ' . . . a fraudulent person can in no event lose anything by his fraud. He runs the chance of making a profit if he successfully carries out his plan and is not afterwards brought to account for it; and if he is brought to account, he will lose nothing by his conduct.'

"Section 3343 of the Civil Code does not state that the out-of-pocket rule is the exclusive measure of damages for fraud. Accordingly this court upholds the decision of the trial court and the appellate department of the superior court in deciding that the rule announced in *Ward* v. *Taggart* reestablishes the right of recovery of damages other than upon the 'out-of-pocket' rule in fraud sale cases; that such right is cumulative

and alternative to that embraced by the rule in the *Bagdasarian* case; that the instant case is resolvable upon the theory presented in the *Ward* v. *Taggart* case."

By the process of judicial evolution, the concurrence and dissent by Justice Schauer in *Bagdasarian, supra,* became the opinion by Justice Burke. *Channell* v. *Anthony,* 58 Cal.App.3d 290, 311-312 [129 Cal.Rptr. 704], contains an excellent review of the hard road followed by *Bagdasarian, supra.* Any doubt existent prior to 1971, concerning recoverability of lost profits, anticipated gain, under Civil Code section 3343, was put to rest by *Eatwell* v. *Beck,* 41 Cal.2d 128 [257 P.2d 643].

In this critical judicial atmosphere, Civil Code section 3343 was amended in 1971. The Legislature removed all doubt concerning the recovery of loss of profits resulting from the fraudulently induced property acquisition. Clearly and specifically, lost profits proximately caused are recoverable. The cases cited, the arguments made concerning Civil Code section 3343 limitations are simply not relevant to post-1971 proceedings, where profits are the claimed loss. Civil Code section 3343 as amended, in so many words, authorizes recovery of lost profits. Hartman was therefore entitled, on the facts presented to the jury to recover as damages "for any loss of profit or other gains which were reasonably anticipated and would have been earned by him from the use or sale of the property had it possessed the characteristics fraudulently attributed to it . . ." To recover under the amended statute, Hartman must have acquired the property for use (subd. (a)(4)(i)), and have reasonably relied upon the fraudulent representation (subd. (a)(4)(ii)), and the loss must be the proximate result of the fraud (subd. (a)(4)(iii)). Shell's first arguments appear to ignore the express language of Civil Code section 3343 as amended. However, a second tack appears, when Shell admits: "The amendment [1971] provides that additional damages [loss of profits] may be recovered based upon what [Hartman] would have earned if the property acquired . . . contained the characteristics fraudulently attributed to it" but argues the amended section is not applicable to the facts of this case.

The representations made by McFarlin attributed certain characteristics to the property to be acquired (leased). The old Shell station would be, if Shell was unable to buy the new American Oil station across the street, "expanded," "rebuilt," or Hartman would be transferred into the acquired American Oil station converted to a Shell station. The 1971 amendment to Civil Code section 3343 does not speak in terms of

present or past "characteristics," as distinguished from characteristics of the property represented to be acquired in the future. The section is not limited by its language to *physical* characteristics of the property induced to be acquired. A significant, albeit nonphysical, characteristic of the property Hartman was induced to lease was that it would be upgraded, expanded on the condition specified. Had the property the characteristic falsely attributed to it, to be expanded, or the opportunity extended to move to a better location across the corner, then he, Hartman, could reasonably have expected profits from the uses he anticipated at the station.

If Shell's arguments concerning the nonapplicability of the 1971 amendment to Civil Code section 3343 has any merit (and the case history of the section pre-1971, the circumstances of the amendment, its language and its obvious purpose, belie such a conclusion), then Shell must face the line of decisions following *Ward* v. *Taggart, supra,* 51 Cal.2d 736. From the frying pan, Civil Code section 3343, subdivision (a)(4)(i), (ii), (iii), Shell Oil Company falls into the fire, Civil Code section 1709, which provides, "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers" (*Lawson* v. *Town & Country Shops, Inc., supra,* 159 Cal.App.2d 196, 203-204). The jury was properly instructed on the measure of damages.

Defendant contends the award of $15,000 punitive damages was error; that there was no evidence of corporate responsibility, management's authorization, or ratification of the misrepresentations of McFarlin. The jury was correctly instructed as to the requirements of authorization or ratification as the prerequisite to imposing punitive damages on a corporate principal. ■ To hold a principal liable for punitive damages, it must be shown that the employee-agent's malicious acts were done with knowledge or under the direction of the principal-employer, that is to say, were authorized, or the acts were ratified by the principal with knowledge of the willful and malicious character of such acts (*Ebaugh* v. *Rabkin,* 22 Cal.App.3d 891, 896 [99 Cal.Rptr. 706]; *Hale* v. *Farmers Ins. Exch.,* 42 Cal.App.3d 681, 690 [117 Cal.Rptr. 146]).

We resolve this question by ascertaining whether there is substantial evidence to support the implied findings of the jury on the question of knowledge, authorization or ratification on the part of Shell Oil Company for the acts of its agent, McFarlin. The jury impliedly found McFarlin guilty of fraudulent misrepresentations inducing Hartman to

enter into the lease agreement, dealer's contract and promissory note. The verdict for punitive damages rests upon the further implied finding of a knowledgeable approval, authorization or ratification of that wrong by Shell at the level of responsible corporate management. The rationale for the general rule is that punitive damages will have no deterrent effect if awarded against a party not responsible for the wrong (4 Witkin, Summary of Cal. Law (8 ed. 1974) Torts, § 855, p. 3147).

Shell argues that none of the evidence relied upon by Hartman to establish the basis for punitive damages was known to any officer or any person in authority at Shell Oil Company; that the wrongful acts, the representations, were made by a "low-level" agent or employee below the level of responsible management, and therefore the corporation cannot be held responsible for punitive damages. Liability will be imposed where the fraud is committed by an agent or employee acting in a managerial capacity absent a showing of authorization or ratification (*Toole* v. *Richardson-Merrell, Inc.,* 251 Cal.App.2d 689, 711-712 [60 Cal.Rptr. 398, 29 A.L.R.3d 988], and cases cited therein; Rest., Torts, § 909). ▆ There was clear and satisfactory evidence before the jury that false representations were made to Hartman by McFarlin. All the elements of actionable fraud were present. Houk, McFarlin's supervisor, denied the making of the oral promises, and denied he had been told by McFarlin or by Hartman of these promises (despite the letter of June 1972 from Hartman, admittedly received, explicitly setting out the promises). The jury was required to evaluate the truthfulness of the respective witnesses and it found for Hartman. Houk was the sales supervisor for Shell Oil Company and the immediate supervisor of McFarlin. Houk had met Hartman as a prospective dealer in 1971. He knew of Shell's purchase of the American Oil stations in May of 1972. He had talked with McFarlin about the purchase of the American Oil stations in the spring of 1972. Houk met with Williamson, who was a district manager for Shell, in June 1972, after he had received a letter from Hartman which clearly and explicitly put Houk, and Williamson through Houk, on notice of the fact that McFarlin had made certain promises to Hartman concerning the availability of the American Oil station. The letter of June 1972, from Hartman to Houk, recites the promises made by McFarlin as: "[I]n the event of the acquisition by Shell Oil Company of the American property, [Hartman's] station would be moved across the street; or, in the alternative, the present location would be enlarged." Houk makes the interesting admission; "four weeks" prior to the receipt of this letter he had discussed with Hartman a list of other stations that were possibilities to which Hartman could

move. It is a fair inference therefrom that Houk was aware, prior to the June letter—as Hartman testified—of Hartman's claim that McFarlin had made certain promises to him to induce his signing the documents in question. There is no question that as of June 1972 the two highest Shell officials in the San Diego region, Houk and Williamson, were aware of the alleged promises; yet each refused to honor the McFarlin promises. This refusal to honor the promises was with full knowledge of the nature of the representations made. ■ The bringing of an action or the basing of a defense on an unauthorized act with knowledge of the material facts is, at a minimum, some evidence of ratification (Rest., Agency, § 97; *Hildebrand* v. *Beck*, 196 Cal. 141, 147 [236 P. 301, 39 A.L.R. 1076]). ■ Shell relied strongly for its defense on trial, and still relies upon, the written (integrated) dealer's lease and agreement, to preclude, to block any claim Hartman makes of oral promises outside the written documents. A jury could rationally infer that this contract provision, placed therein by the Shell authorities, was for the specific purpose of avoiding responsibilities for oral promises made by the field agents to prospective dealers. There was no evidence before the jury that the Shell representative making the false representation was discharged or even reprimanded. This is some evidence of the principal's approval (*Coats* v. *Construction & Gen. Laborers Local No. 185,* 15 Cal.App.3d 908, 915 [93 Cal.Rptr. 639], and cases cited). Evidence of the supervisorial-management status of Houk and Williamson in the Shell Oil Company corporate apparatus was presented. It must be admitted there is no direct evidence of Shell's directors or officers—board members—authorizing or condoning the misrepresentations here involved. It would indeed be a startling bit of evidence if such did appear. The jury was left with a totality of circumstantial evidence and those reasonable inferences of knowledge, approval or ratification which could be derived therefrom. The question of authorization, and/or ratification, of McFarlin's misstatement at the level of responsible management, were submitted to a properly instructed jury. There is substantial evidence to support the implied finding of authorization or ratification at a responsible management level.

Defendant contends Hartman's claim is barred by the statute of frauds (Civ. Code, § 1623). Hartman sought damages for false representations inducing him to enter into the contracts in question. This is not an action on an oral contract. The contention has no merit (*Kett* v. *Graeser,* 241 Cal.App.2d 571, 573 [50 Cal.Rptr. 727]).

Shell Oil Company argues that the parole evidence rule bars recovery here. This argument rests upon the "integrated" language contained in the dealer's lease and dealer's agreement signed by the parties. The dealer's agreement says in part: "This Agreement comprises the entire agreement . . . concerning the subject matter . . . ." The dealer's lease says in part, "This lease . . . constitutes the entire contract . . . ." Where parties to a written agreement have agreed to it as an integrated, complete and final embodiment of the terms, parole evidence cannot be admitted to add to or vary its terms (*Masterson* v. *Sine,* 68 Cal.2d 222, 225 [65 Cal.Rptr. 545, 436 P.2d 561]). Hartman, here, did not offer the evidence concerning the false representations to add or to vary the terms of the contract. Parole evidence is always admissible to prove fraud, including circumstances where a purportedly fraudulently induced contract contains relevant exculpatory language, or integration clauses, as here. The parole evidence rule is not intended to be a shield for fraud (*Munchow* v. *Kraszewski,* 56 Cal.App.3d 831, 836 [128 Cal.Rptr. 762], and cases cited).

Defendant alleges misconduct of Hartman's attorney in final argument in that he told the jury, "the judge has already overruled in chambers the contention involved." Such language is not in the transcript. The contention is devoid of merit. Equally weightless is defendant's argument that a lawyer in final argument may not traverse, deny, denounce, and otherwise try to establish in the minds of the jury that the position of opposing counsel is not supported by the record. This is the precise objective and purpose of oral argument. The statements made by plaintiff's counsel were well within the realm of permissible advocacy. Further, defendant made no complaint. A claim of misconduct of this nature is entitled to no consideration on appeal unless the record shows a timely and proper objection and requests the jury be admonished (*Sabella* v. *Southern Pac. Co.,* 70 Cal.2d 311, 318 [74 Cal.Rptr. 534, 449 P.2d 750]).

Shell Oil Company's final argument is that the trial court erred in its refusal to allow Shell to amend its pleadings to conform to proof of the affirmative defense of accord and satisfaction. The trial court correctly denied the motion on the basis that there were no facts before the jury to authorize such an amendment. The letter from Hartman's attorney, upon which Shell relied as a basis for its contention of an accord and satisfaction by reason of a reduction in rent on the old Shell station, on its face gives no inkling of any intention whatsoever on the part of Hartman to settle the entire dispute. Quite to the contrary, Hartman's

counsel says, "We are not abandoning any rights we may have under Mr. Hartman's agreement with Shell Oil Company . . . ." The contention is therefore without merit.

Judgment affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 12, 1977. Sullivan, J.,* did not participate therein.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.