**TENNANT COMPANY, Appellant,**

v.

**ADVANCE MACHINE COMPANY, INC., Respondent.**

No. C6–83–1961.

Court of Appeals of Minnesota.

Sept. 18, 1984.

Lawrence C. Brown, Brian B. O'Neill, Amy B. Bromberg, Faegre & Benson, Minneapolis, for appellant.

Edward J. Schwartzbauer, Irving R. Colacci, Dorsey & Whitney, Minneapolis, for respondent.

Heard, considered and decided by PARKER, P.J., and FOLEY and HUSPENI, JJ.

## OPINION

PARKER, Judge.

Tennant appeals from a judgment notwithstanding the verdict that denied it a $400,000 punitive damage award. The court determined that punitive damages could not be imputed to Advance for acts of its employees. Advance cross-appeals the jury's award of $100,000 compensatory damages to Tennant. Advance contends that its employees did not convert tangible property from Tennant's dumpster, that the court erred by submitting the issue of unfair competition to the jury, and that the court prejudiced the jury with an instruction that the conduct of Advance employees was unlawful. We affirm the award of compensatory damages and reverse the judgment notwithstanding the verdict setting aside the punitive damage award.

## FACTS

Tennant and Advance are competitors in manufacturing and marketing floor cleaning equipment. From fall 1978 through spring 1979, certain Advance employees rummaged through the trash in a dumpster behind Tennant's western regional sales offices in California. The raids uncovered some confidential sales information that George McIntosh, an Advance employee, forwarded to other Advance salesmen and to company officers.

McIntosh himself was a sales representative denominated as Advance's "West Coast Sales Manager." He earned commissions from his sales and also was salaried by Advance. He was involved in training some sales personnel. McIntosh enlisted Ralph Randeau, Advance's San Francisco sales manager, to help rifle Tennant's dumpster. McIntosh earned an override on commissions from Randeau's sales. McIntosh reported directly to Jerry Rau, Advance's vice president for industrial sales. Rau did not closely supervise McIntosh's activities; McIntosh had discretion to deal with customers. McIntosh sent Rau memos summarizing information from stolen documents.

Rau testified that when he learned of the clandestine activity in early 1979 he:

handled it very lightly because I did not consider it a terrible thing. I considered it kind of a joke. I did not think there was any value of anybody doing that, and I had no concept of it being so.

Later in the year Rau instructed McIntosh to stop raiding Tennant's trash.

Robert Pond, president of Advance, personally hired McIntosh and Randeau. Early in 1979 Pond learned about this activity from Rau. Pond also handled it "in a very light fashion rather than a serious fashion," until this lawsuit was commenced in early 1980. Then he discharged McIntosh. Pond assumed some of Rau's duties when Rau had a heart attack in late 1978. Pond

thereafter received memos directed to Rau containing information gleaned from the dumpster. When asked whether he thought raiding the dumpster and rifling through a competitor's trash was unethical, Pond equivocated by saying that he did not have enough information to make a judgment on those practices.

Prior to submitting this matter to the jury the court granted Tennant's motion for directed verdict on the ground of conversion. The jury independently determined that McIntosh and Randeau were acting within their scope of employment, that Advance engaged in unlawful business practices, and that Tennant was entitled to $100,000 compensatory damages and $400,000 punitive damages. The court granted Advance's motion for judgment n.o.v. on the issue of punitive damages. It determined that Advance could not be held liable for the malicious acts of its employees. This decision was foreshadowed by the court's earlier comments to counsel doubting the propriety of punitive damages. The parties agree that California law governs this matter.

## ISSUES

1. Did the court err in granting a judgment notwithstanding the verdict on the ground that punitive damages may not be awarded against Advance for the acts of its employees?

2. Did the court properly direct a verdict against Advance on the conversion issue?

3. Did the court properly submit the issue of unfair business competition to the jury?

4. Was Advance entitled to a new trial because of a purportedly prejudicial jury instruction?

## DISCUSSION

### I

■ In reviewing a judgment notwithstanding the verdict, we accept the evidence in the light most favorable to the verdict. *Edgewater Motels, Inc. v. Gatzke,* 277 N.W.2d 11, 14–15 (Minn.1979). When there is a reasonable basis for the verdict it shall be reinstated. *Id.*

■ Punitive damages may be awarded for the underlying kinds of malicious activity here. *See* West's Ann.Cal.Civ.Code § 3294. The question is under what circumstances those damages may be imputed to a principal for the acts of its agent. California follows the rule stated in *Restatement (Second) of Torts* § 909 (1965), which provides:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if, * * *
>
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
>
> (d) the principal or a managerial agent of the principal ratified or approved the act.

*See Hale v. Farmers Ins. Exch.,* 42 Cal. App.3d 681, 117 Cal.Rptr. 146 (1974). The jury was instructed verbatim under this statute. The same standard is codified into Minnesota law. Minn.Stat. § 549.20, subd. 2 (1982). Since both states apply the same rule, our decision speaks to the Minnesota business community as well.

Section 909 imposes punitive damages to deter employment of unfit persons for important positions. It reflects certain policy judgments about corporations, primarily that top management sets the company's ethical tone. Accountability of the principal is necessary to enforce corporate responsibility:

> If we allow the master to be careless of his servants' torts we lose hold upon the most valuable check in the conduct of social life.

Laski, *The Basis of Vicarious Liability,* 26 Yale L.J. 105, 114 (1916). In this case the president of Advance, who personally hired the individuals responsible for illegal activity, was indifferent to the ethics of their behavior.

### McIntosh had managerial capacity

To determine managerial capacity, the critical inquiry regards the degree of discretion the employee possesses in making decisions that ultimately will determine corporate policy. *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 823–24, 620 P.2d 141, 148, 169 Cal.Rptr. 691, 698 (1979). Advance empowered McIntosh with unfettered discretion. Rau placed no restraints on the activities of McIntosh. McIntosh was salaried, had no set hours, and carried out his duties at will. He trained other Advance employees but was not himself trained or closely supervised by Advance officers. He earned commissions from the sales of those, including Randeau, working beneath him. As intermediary between top-level management and distributors, he was a front-line policy maker. He trained distributors to sell and gave them sales leads. The jury could conclude that he had managerial discretion.

McIntosh carried out the illegal activity with a manager's title given him by Advance. This by itself denotes managerial capacity. *Id.* at 824, 620 P.2d at 148, 169 Cal.Rptr. at 698. *Egan* involved the responsibility of the insurer for punitive damages on account of the malicious acts of its claims department manager. The employee's business card identified him to the public as "Manager, Benefits Department, Mutual of Omaha." The court found this ostensible authority to be one factor signifying managerial capacity under section 909. McIntosh was held out to the public as "West Coast Sales Manager"; thereby Advance advertised his managerial capacity. Since there is a reasonable basis for the verdict, it must be reinstated.

### Advance ratified the unlawful activity

Ratification may be proved by circumstantial evidence:

Anything which convincingly shows the intention of the principal to adopt or approve the act in question is sufficient. It may also be shown by implication. " * * * where an agent is authorized to do an act, and he transcends his authority, it is the duty of the principal to repudiate the act as soon as he is fully informed of what has been thus done in his name, * * * else he will be bound by the act as having ratified it by implication." *Hale* at 692–93, 117 Cal.Rptr. at 154 (citations omitted). Both the president and vice president of Advance, Pond and Rau, were aware of McIntosh's activities early in 1979. Rau had discussed the matter directly with McIntosh. He also received memos containing the illegal information. The obviously sensitive nature of the material would have caused suspicions about their source. Pond had been informed by Rau and received the same memos when Rau was recovering from his heart attack. Pond claimed that he never reviewed the memoranda. Under like circumstances, the California Court of Appeals rejected this defense:

[T]he jury could infer that it was [reviewed], and that all of the conduct of the individual defendants became known to the corporation through such examination. * * * [Their] conduct was thus ratified.

*Id.* at 693, 117 Cal.Rptr. at 154.

Advance officers took no action against McIntosh until nearly one year after the fact. The failure to discharge or even to reprimand an agent for illegal activity is evidence of the principal's approval. *Hartman v. Shell Oil Co.*, 68 Cal. App.3d 240, 251, 137 Cal.Rptr. 244, 251 (1977). Pond never repudiated the act by informing Tennant of its occurrence. In fact, he was equivocal about the ethics of the activity.

While there was no direct evidence of ratification, "[i]t would indeed be a startling bit of evidence if such did appear." *Id.* The jury nonetheless had ample circumstantial evidence to sift through:

Whether the trial judge, or we, concur with the jury's evaluation of the testimony is not controlling. The controlling factor is that there was evidence from which the jury could have inferred * * * ratification of the acts of [the employees].

*Hale* at 693, 117 Cal.Rptr. at 154. Therefore, the judgment notwithstanding the verdict must be reversed and the punitive damage award reinstated.

## II

The court directed a verdict on the conversion count. To prevail Tennant had to have shown a protectable property interest in the stolen documents. Advance contends that the documents were abandoned once they were placed in the dumpster.

■ California law is settled that an owner retains a reasonable expectation of privacy in the contents of a dumpster "until the trash [has] lost its identity and meaning by becoming part of a large conglomeration of trash elsewhere." *People v. Krivda,* 5 Cal.3d 357, 367, 486 P.2d 1262, 1268, 96 Cal.Rptr. 62, 68 (1971). This rule was devised in the context of a Fourth Amendment search by law officers. We see no reason for applying a different standard in the civil mode. One has the same expectation of privacy in property regardless of whether the invasion is carried out by a law officer or by a competitor; business has as great a right to protection from industrial espionage as it has from any other theft.

■ Tennant disposed of its documents in sealed trash bags. The bags were put into a covered dumpster that was used solely by Tennant. The court correctly determined that the documents were not abandoned.

Advance also asserts that the documents, mere sheets of paper, had no tangible property value. In that event no conversion of property took place. The better view, acknowledged by California courts, is that customer lists have property value for purposes of conversion. *Palm Springs-La Quinta Development Co. v. Kieberk Corp.,* 46 Cal.App.2d 234, 115 P.2d 548 (1941); *People v. Dolbeer,* 214 Cal.App.2d 619, 29 Cal.Rptr. 573 (1963); *see also State v. Gage,* 272 Minn. 106, 110, 136 N.W.2d 662, 665 (1965).

## III

■ Advance had moved for a directed verdict on the issue of unfair competition. The California Unfair Practices Act defines unfair competition broadly as "any unlawful, unfair or fraudulent business practice." West's Ann.Cal.Bus. & Prof.Code § 17200. Misappropriation of trade secrets constitutes unfair competition and an unlawful or unfair business practice. *See Bowser, Inc. v. Filters, Inc.,* 398 F.2d 7, 9 (9th Cir.1968) (applying California law).

■ Advance asserts that Tennant's customer lists do not constitute trade secrets. California courts recognize six factors in determining whether information is a trade secret:

1. The extent to which the information is known outside the business;

2. the extent to which it is known by employees and others involved in the business;

3. the extent of measures taken to guard the secrecy of the information;

4. the value of the information to its owner and its owner's competitors;

5. the amount of effort or money expended by the owner to develop the information;

6. the ease or difficulty with which the information could be properly acquired or duplicated by other persons or organizations.

*See Futurecraft Corp. v. Clary Corp.,* 205 Cal.App.2d 279, 23 Cal.Rptr. 198 (1962).

■ A corporation that markets products does not advertise its sales leads. This information is confidential and generally would not be known outside the business. Prior to the activity of McIntosh and Randeau, Tennant did not experience loss of sales information. It disposed of its waste in a manner that would assure secrecy except to someone particularly intent on finding out inside information. The measures taken to guard the secrecy of the sales lists were adequate.

· Sales leads are of great value both to Tennant and to Advance. They cost Tennant employees considerable time and mon-

ey to develop. By appropriating the lists Advance could target its sales much more effectively and at less cost. Advance could duplicate similar lists only after great expense. It was appropriate to let the jury determine whether the sales lists constituted trade secrets.

## IV

Advance contends that the jury charge was prejudicial, compelling a new trial. The court told the jury that the conduct of Advance employees "in removing trash from the dumpster and extracting sales information from that trash was unlawful." Referring to Advance's liability, the jury was told that unfair competition means "unlawful" activity. Whether use of the word "unlawful" twice resulted in a confusing and prejudicial jury instruction is a procedural question governed by Minnesota law. Errors in jury instructions:

> are likely to be considered fundamental or controlling if they "destroy the substantial correctness of the charge as a whole," cause a miscarriage of justice, or result in substantial prejudice.

*Lindstrom v. Yellow Taxi Co. of Minneapolis*, 298 Minn. 224, 229, 214 N.W.2d 672, 676 (1974) (footnotes omitted). The court did instruct properly. Because the jury was told that McIntosh's and Randeau's activities were unlawful does not mean the jury necessarily would impute that unlawful conduct to the employer. The jury was properly instructed according to § 909 of the *Restatement*. "Unlawful" appeared in separate contexts and related to separate activity. It is sufficiently clear from reading the instruction as a whole that there was little likelihood of confusing the jury. There is no basis for a new trial.

### DECISION

We reverse the court's judgment notwithstanding the verdict on the issue of punitive damages and order the award reinstated. We affirm the directed verdict against Advance on the ground of conversion. We affirm submission of the issue of unfair competition to the jury. We affirm

the court's decision to deny Advance a new trial on grounds of a purportedly prejudicial jury instruction.

Affirmed in part, reversed in part.