**James Harold PETERSON and Paula Peterson, Appellants,**

**v.**

**CITY OF PLYMOUTH, MINNESOTA; Michael Ridgley; David Lindman; Mark Bevins; Steven Scollard; and Scott Kluck, Appellees.**

**No. 90–5476.**

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1991.

Decided Oct. 1, 1991.

Rehearing and Rehearing En Banc Denied Nov. 18, 1991.

---

Barry G. Reed, Minneapolis, Minn., for appellants.

Gail Langfield–Seiberlich, Circle Pines, Minn., for appellees.

Before WOLLMAN and BEAM, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.

BEAM, Circuit Judge.

James and Paula Peterson brought an action under 42 U.S.C. § 1983 alleging violations of their rights under the Third, Fourth, Fifth and Fourteenth Amendments as well as a variety of state law actions [1] against the City of Plymouth, three Plymouth police officers, and two other non-municipal defendants. In two separate orders, the district court granted summary judgment in favor of the City of Plymouth and the police officers on all of the Petersons' claims except for one, which the court simply dismissed without prejudice. The court later dismissed without prejudice the remaining claims against the non-municipal defendants on the stipulation of the parties. The Petersons appeal. We affirm in part and reverse in part.

I. BACKGROUND

The Petersons are the owners of a house, which they rented to three individuals, including defendant Scott Kluck, on approximately November 1, 1985. The Petersons allege that the tenants substantially damaged the house and the lawn, stole items from the premises, failed to pay the rent, and left unpaid utility bills. Kluck and another co-tenant moved out of the house on approximately July 31, 1986. The third co-tenant, David Schummer, asked to remain in the house and Mr. Peterson agreed.

Schummer moved out of the house on September 27, 1986, and, according to Mr. Peterson, left it in disarray. Several items, including an old car and a snowblower were left in the garage. The car was removed within a few days, but the snowblower and other items remained. Peterson concluded that these items had been abandoned and hauled them to a locked shed belonging to a friend. Peterson, a lawyer, understood that pursuant to Minnesota landlord/tenant law, he was entitled after sixty days to sell or otherwise dispose of property abandoned by vacating tenants to recover part of his losses. *See* Minn. Stat.Ann. § 504.24 (West 1990).

---

1. The state law actions included false arrest and imprisonment; intentional infliction of emotional distress; negligence and respondeat superior; negligent training and supervision; abuse of process and malicious prosecution; conversion; and defamation.

On October 7, 1986, Steven Scollard, a person not previously known to Peterson, came to the house and spoke with Peterson. Scollard stated that his name was Steve, claimed to own the snowblower, and demanded its return. Peterson told Scollard that he was very angry and wanted Kluck to pay for the damage done to the house and lawn. Peterson also told Scollard that he considered the snowblower abandoned property. Doubting Scollard's unsupported claim of ownership, Peterson refused to surrender the snowblower.

After talking with Peterson, Scollard returned to his car and called the police from a cellular phone. Peterson went inside the house, but returned shortly and stood at the bottom of the house's front doorstep, watching Scollard. At this time, a City of Plymouth Police squad car pulled up in front of the house. The police officers, defendants David Lindman and Mark Bevins, approached Scollard and talked with him briefly. Scollard accused Peterson of stealing his snowblower. The officers then walked across Peterson's front yard to ask him some questions. Peterson told the police that he owned the property, that the dispute was a civil matter and that unless they had a warrant, they should leave his property. When the officers asked Peterson what his name was, he responded that he was not answering any questions and again told them to leave.

Peterson turned to go inside his house, but the police officers stepped in front of him and blocked his way. Peterson again told the officers to acquire a warrant and attempted to enter the house. The officers then seized Peterson's arms and began to take him back to their squad car. Peterson asked the officers if he was under arrest and they responded no.[2] Peterson, however, protested that placing him in the back of the squad car would constitute an arrest. Disregarding Peterson's protest, the officers searched him and placed him in the back of their car for over twenty minutes while they continued their investigation. A

grill separated the back of the car from the front and the closed rear doors could not be opened from the inside. The officers ultimately warned Peterson that he might be charged with felony theft and released him after another unsuccessful attempt to question him.

Defendant Michael Ridgley was assigned to investigate the charges. After receiving the patrol officers' reports, Ridgley obtained a statement from Scollard dated October 8, 1986. Scollard claimed that he owned the snowblower and that he had left it with a friend (Schummer). Scollard also indicated that Kluck was his partner in a snow removal business. Finally, Scollard asserted that Peterson had removed the snowblower and demanded ransom for its return. Ridgley also obtained a statement from Kluck, dated October 22, 1986. Kluck admitted that he had moved out of the house by August 1, 1986, but asserted that he and Scollard had asked Schummer to store the snowblower. Kluck also indicated that at the time he moved out, he and Scollard were co-owners of the snowblower, but stated that Scollard now had full ownership. On November 24, 1986, Ridgley telephoned Schummer who also stated that he had been storing the snowblower on behalf of Kluck and Scollard. Ridgley later called Peterson at his office on October 16 and 17, 1986, but Peterson never returned the calls.

On October 29, 1986, Ridgley obtained a search warrant for the Petersons' home. Ridgley and two other officers of the Plymouth Police Department executed the warrant the next day. While searching for the snowblower and a copy of a lease, Ridgley entered the Petersons' whirlpool room and discovered Mrs. Peterson naked in the bath. Two days later, on October 31, 1986, Ridgley signed a sworn complaint and obtained an arrest warrant for Mr. Peterson. The complaint incorrectly alleged that Kluck had moved out of the house in October. The same day, two Hennepin County

---

**2.** The parties appear to disagree slightly as to the timing of certain events during the encounter between Peterson and officers Bevins and Lindman, in particular, whether Peterson asked if he was under arrest before being taken to the squad car. Nonetheless, the parties appear to agree on the essential facts.

sheriffs executed the warrant and arrested Peterson, a Minneapolis city attorney, at his office in front of his staff and colleagues. Peterson agreed to report to the Hennepin County Adult Detention Center where he was charged with felony theft and detained. The charges against Peterson eventually were dismissed for lack of probable cause.

## II. DISCUSSION

### A. Qualified Immunity

The Petersons initially assert that the district court improperly granted summary judgment in favor of officers Bevins, Lindman and Ridgley on the basis of qualified immunity. State officials are entitled to immunity in a section 1983 action if their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The court must examine the " 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987) (quoting *Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738–39).

A threshold question in determining whether an officer's conduct violated a constitutional right " 'clearly established' at the time" is "whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, — U.S. —, —, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). At least as to their Fourth Amendment claim, the Petersons satisfy this threshold requirement.[3] The Petersons allege, inter alia, that officers Bevins and Lindman arrested Mr. Peterson without probable cause and that officer Ridgley caused a second unlawful arrest of Mr. Peterson by swearing out a complaint and arrest warrant without probable cause. These allegations state clear violations of the Fourth Amendment's protection against unreasonable seizures. *See, e.g., Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *Sartin v. Commissioner of Pub. Safety*, 535 F.2d 430, 434 (8th Cir.1976).

### 1. Officers Bevins and Lindman

■ Officers Bevins and Lindman admit that there was no objective or subjective basis to establish probable cause to arrest Peterson, but instead insist that their actions constituted nothing more than an investigatory stop based on articulable suspicion that Peterson had committed a crime. Bevins and Lindman, therefore, are entitled to immunity for their conduct only if there is an objectively reasonable basis for one to believe that they were not arresting Peterson when they placed him in the squad car.

■ The general rule governing when a seizure constitutes an investigatory stop, and not an arrest, is well established. The police have seized someone if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *see Florida v. Bostick*, — U.S. —, —, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). A seizure is merely an investigatory stop, however, where "the officer's action was justified at its inception, and ... was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). In determining whether an officer's conduct during a purported investigatory stop exceeded the scope justified under the circumstances, thereby transforming the stop into an arrest, the court should consider the following factors: (1) the number of officers and police cars involved, (2) the nature of the crime and whether there is reason to believe the suspect is armed, (3) the strength of the

---

**3.** The record on appeal focuses on the Petersons' Fourth Amendment claim and fails to reveal the precise nature of their Third and Fifth Amendment claims. Although we could draw certain inferences from the record, we decline to engage in speculation. Instead, we leave these claims for the district court to consider in light of this opinion.

officer's articulable, objective suspicions, (4) the need for immediate action by the officer, (5) the presence or lack of suspicious behavior or movement by the person under observation, and (6) whether there was an opportunity for the officer to have made the stop in less threatening circumstances.

*United States v. Seelye*, 815 F.2d 48, 50 (8th Cir.1987).

Although officers Bevins and Lindman refused to recognize it at the time, they had arrested Peterson. Peterson expressly informed the officers that he was the owner of the house, that the dispute was a civil matter, and that he wanted them to leave immediately. The officers already knew Peterson's name and where to contact him. Yet in total disregard of Peterson's protests, the officers seized him, removed him from his property, and locked him in the back of their squad car for twenty minutes. Under the circumstances, Bevins and Lindman's seizure of Peterson constituted an arrest. Even if the officers had an articulable suspicion that Peterson had committed a crime and desired to detain him so as to maintain the status quo during their preliminary investigation, the form of detention involved here clearly exceeded the scope justified. Although Peterson was not very cooperative, the need for immediate action was not significant and ample opportunity existed to detain Peterson, if necessary, in a less threatening manner. *See United States v. Thompson*, 906 F.2d 1292, 1297 (8th Cir.) (placing suspects in separate squad cars constituted an arrest under the circumstances), *cert. denied*, —— U.S. ——, 111 S.Ct. 530, 112 L.Ed.2d 540 (1990); *State v. Lohnes*, 344 N.W.2d 605, 610 (Minn.1984) (suspect arrested where held inside police car for three to four hours);[4] *cf. Florida v. Royer*, 460 U.S. 491, 502–03, 103 S.Ct. 1319, 1326–27, 75

L.Ed.2d 229 (1983) (plurality opinion) (suspect arrested where taken to small police room at airport for questioning).

An objectively reasonable officer in Bevins and Lindman's position could not have believed that the intrusion on liberty involved in locking Peterson in a squad car for twenty minutes was sufficiently limited under the circumstances so as to constitute merely an investigatory stop. Because Bevins and Lindman admit that they did not have probable cause to arrest Peterson, they acted unreasonably and, hence, are not entitled to qualified immunity.

### 2. Officer Ridgley

■ Ridgley is entitled to immunity for swearing out a complaint and arrest warrant against Peterson only if a reasonably competent officer would have had an objectively reasonable belief that probable cause existed for Peterson's arrest. *See Malley*, 475 U.S. at 341, 106 S.Ct. at 1096. The fundamental question is "whether a reasonably well-trained officer in [the same] position would have known that [the evidence] failed to establish probable cause and that he should not have applied for the warrant." *Id.* at 345, 106 S.Ct. at 1098.

The weakness in Ridgley's case was the complete absence of evidence that Peterson had any criminal intent to commit theft. The statute which Ridgley accused Peterson of violating requires that the property be taken "intentionally and *without claim of right.*" Minn.Stat. § 609.52(2)(2) (1983) (emphasis added). In interpreting this statute's precursor, the Minnesota Supreme Court held that no criminal intent exists where the defendant takes property "with the reasonable and actual belief that it was abandoned." *State v. Gage*, 272 Minn. 106, 136 N.W.2d 662, 665 (1965). Ridgley knew that Peterson claimed entitlement to the

---

**4.** The district court attempts to distinguish *Lohnes* by emphasizing that Peterson only was detained for a short period of time. *Peterson v. City of Plymouth*, No. 4–88–317, Order at 13, (D.Minn. Mar. 27, 1990). In support of its analysis, the district court cites *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), in which the Supreme Court held that a twenty minute roadside detention was not

an arrest, *id.* at 688, 105 S.Ct. at 1576. Although the length of detention is relevant in determining whether a stop constitutes an arrest, the nature of the detention also is important. *See id.* at 684, 105 S.Ct. at 1574. Unlike the defendant in *Sharpe* who was detained on the roadside near his own vehicle, Peterson was forced into and locked inside a squad car.

snowblower as abandoned property under Minnesota landlord/tenant law. He also knew the essential facts supporting Peterson's claim, in particular, that Kluck was a co-owner of the snowblower when he moved out and that Peterson waited sixty days before seizing the snowblower. Whether or not Peterson's civil claim to the snowblower was valid, he obviously lacked the criminal intent necessary for felony theft.[5]

The facts of this case clearly demonstrate that the dispute over the snowblower was one properly resolved in the civil, not criminal, courts. Ridgley knew or should have known this; no reasonable officer could have concluded otherwise. Consequently, Ridgley is not entitled to qualified immunity.

### B. Intentional Infliction of Emotional Distress

The Petersons assert that the district court improperly granted summary judgment in favor of the municipal defendants on their claim for intentional infliction of emotional distress. To sustain such a cause of action under Minnesota law, the plaintiff must show that the defendant's conduct was extreme and outrageous, that it was intentional or reckless, that it caused emotional distress, and that the distress was severe. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438–39 (Minn. 1983). The emotional distress must be " 'so severe that no reasonable [person] could be expected to endure it.' " *Id.* at 439 (quoting *Restatement (Second) of Torts* § 46 comment j (1965)). To avoid "fictitious and speculative claims," Minnesota courts have construed the severity requirement very restrictively. *See, e.g., id.* at 439–40 (depression, stomach disorders, and high blood pressure insufficient); *Ek-*

*lund v. Vincent Brass & Aluminum Co.*, 351 N.W.2d 371, 379 (Minn.Ct.App.1984) (embarrassment, loss of sleep, stress, anxiety, depression, loss of self-confidence, and medical and psychological treatment insufficient).

We agree with the district court that the Petersons' claim of emotional distress fails to meet the severity requirement. The Petersons allege that they have suffered illness, sleeplessness, humiliation, anxiety, mental anguish, and loss of reputation. Mr. Peterson also asserts that he has required personal and family counseling, and that his marriage has suffered in significant part because of the loss of Mrs. Peterson's trust. The Petersons' alleged emotional distress, however, is no more severe than the distress that the plaintiffs alleged in *Hubbard* and *Eklund.* Because the Minnesota courts rejected the allegations in those cases as insufficient, we must hold that the Petersons' allegations also are insufficient.[6]

### C. Remaining Claims

Finally, the Petersons seek reversal of the district court's orders dismissing their remaining state law and common law claims.[7] Because the district court essentially dismissed these other claims based on its incorrect conclusions that the arrest and prosecution of Mr. Peterson were lawful, we reverse the district court as to these claims as well.

### III. CONCLUSION

For the reasons stated above, the district court's orders are affirmed in part and reversed in part.

---

**5.** Ridgley's own conduct confirms that he knew his case against Peterson was seriously flawed. Ridgley incorrectly stated in his complaint that Kluck had moved out in October; less than sixty days before Peterson took possession of the snowblower.

**6.** The district court also found that the officers' conduct was not outrageous. *Peterson v. City of Plymouth*, No. 4–88–317, Order at 17 (D.Minn. Mar. 27, 1990). Because we hold that the Peter-

sons' emotional distress was not severe, we need not address this issue.

**7.** The Petersons apparently do not challenge the district court's dismissal of their remaining federal claim, a section 1983 action against the City of Plymouth. Nonetheless, to eliminate any potential ambiguity, we expressly affirm the district court's dismissal of this claim. *See City of Canton v. Harris*, 489 U.S. 378, 392, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989).